[Cite as *State v. Henderson*, 2020-Ohio-6.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28241 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-2999 |
| | : | |
| JAMONE M. HENDERSON, JR. | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 3rd day of January, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Atty. Reg. No. 0095826, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

TRAVIS KANE, Atty. Reg. No. 0088191, 130 West Second Street, Suite 460, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, J.

{¶ 1} Defendant-appellant Jamone M. Henderson, Jr. appeals from his conviction and sentence for rape, tampering with evidence, and aggravated burglary. Henderson contends that the trial court erred by denying his motion to suppress the one-person show-up identification made by the victim. He further contends that the trial court erred by interviewing a juror outside the presence of the defense and by subsequently dismissing that juror from deliberations. Henderson also claims that the trial court erred by certifying a State's witness as an expert in the presence of the jury. He further claims that his convictions were not supported by the weight of the evidence. Finally, Henderson claims that the trial court erred in sentencing.

{¶ 2} We conclude that Henderson has failed to demonstrate that his convictions were not supported by the manifest weight of the evidence. We further conclude that the trial court did not err by denying Henderson's motion to suppress identification testimony. We cannot say that the trial court erred with regard to its interview with or subsequent dismissal of a juror. While we find it would have been the better course of action not to "certify" a witness as an expert in the jury's presence, we cannot say that Henderson has shown plain error. Finally, we conclude that the trial court did not err with regard to the imposition of consecutive sentences.

{¶ 3} Accordingly, the judgment of the trial court is affirmed.

## I. Facts and Procedural History

{¶ 4} On August 30, 2017, the victim, R.A., her boyfriend and her children moved into a townhome located in Kettering, Ohio. On the evening of September 23, 2017, R.A.'s boyfriend left for work, and R.A.'s two older children were staying the night at her

sister's home. Only R.A. and her youngest child remained at home. R.A. put her child to bed around 10:00 or 11:00 p.m. She unintentionally fell asleep beside him while she was watching television.

{¶ 5} At some point during the early morning hours of September 24, 2017, R.A. awakened and noticed a man standing at the end of her bed. The individual, who was holding a knife, told R.A. to turn around. He also asked her if she wanted to die. Because her four-year old child was in the bed with her, R.A. asked to leave the bedroom. The man grabbed her by the hair and walked her downstairs to the living room. The man then pushed her to the corner of the couch and told her to put her head on the couch. When she complied, the man pulled her leggings down to her knees, inserted his penis into her vagina, pulled out, and inserted his penis into her anus. The man then tried to smother R.A. with a blanket while telling her that he would kill her if she told anyone about the assault. When a car's headlights shone through a window into the room, the man ran out the back sliding glass door. The entire incident lasted approximately 30 minutes. Thereafter, R.A. called 911 and reported the attack.

{¶ 6} Kettering Police Department Officer Joshua Wolf was the first to respond to R.A.'s residence. He arrived at her home at approximately 2:00 a.m. Wolf interviewed R.A., who described the perpetrator as a shorter black male with shoulder-length dreadlocks wearing a light blue shirt and blue pants. Officer Devin Maloney arrived next with his K-9, who began tracking the suspect from R.A.'s back door. Maloney was accompanied by Kettering Police Sergeant Douglas Gaudette, who had also arrived on scene.

{¶ 7} Maloney, Gaudette and the K-9 traveled through a courtyard and a

playground located behind R.A.'s townhome. When they were approximately 300 feet from R.A.'s townhome, they observed two males exiting an apartment building. Because one of the males matched R.A.'s description, Maloney identified himself and Gaudette as Kettering Police. The male matching the description walked quickly away and then began running as he went around a corner of the building. Maloney yelled at him to stop and also indicated that he had a K-9 unit. When the officers came around the corner, they observed the male with his hands in the air. The male, who was later identified as Henderson, was no longer wearing a shirt. After searching the area, Gaudette located a knife and shirt behind some bushes approximately eight to ten feet away from Henderson; the police observed a backpack a few feet to Henderson's other side.

{¶ 8} Wolf, who had remained with R.A., received a radio call that a suspect had been located. Wolf asked R.A. whether she would be able to identify her assailant. R.A. indicated that she would, and Wolf then drove her to where Henderson was being detained. Henderson was placed in front of Wolf's cruiser, and R.A. was able to identify him as her assailant. Wolf then transported R.A. to Kettering Hospital.

{¶ 9} At the hospital, R.A. was examined by Sexual Assault Nurse Examiner (S.A.N.E.) Samantha Griffith. Griffith observed abrasions to R.A.'s arm and buttock. Griffith took swabs of R.A.'s anus and vagina. DNA testing was conducted on the rape kit as well as the knife and shirt found near Henderson. The swab from R.A.'s anus matched Henderson's DNA. R.A.'s DNA was found on the knife.

{¶ 10} On October 4, 2017, Henderson was indicted on two counts of rape (force or threat of force) in violation of R.C. 2907.02(A)(2); one count of kidnapping (sexual activity) in violation of R.C. 2905.01(A)(4); one count of aggravated burglary (physical

harm) in violation of R.C. 2911.11(A)(1); one count of aggravated burglary (deadly weapon) in violation of R.C. 2911.11(A)(2); one count of tampering with evidence in violation of R.C. 2921.12(A)(1); and one count of obstructing official business in violation of R.C. 2921.31(A). A jury trial commenced on November 26, 2018.

{¶ 11} On November 29, the jury began deliberations, then was excused for the night at approximately 4:45 p.m. The following day, the jury sent a message to the trial court stating, "one juror * * * has stated she is uncomfortable with making a decision based on previous family experience. She has requested to be replaced on the jury." Court's Exh. No. IV. The trial court discussed the matter with the prosecutor and defense counsel and indicated that the court would interview the juror[1] without the presence of counsel. Defense counsel objected to being excluded from the interview. The trial court noted the objection but proceeded to conduct the following colloquy with the juror without counsel present:

> THE COURT: Okay, ma'am. I've got this note now. Before I talk to you - -
>
> JUROR X: Yes.
>
> THE COURT: - - couple of things I want to be clear. I don't want to know anything about your jury deliberations.
>
> JUROR X: Okay.
>
> TRIAL COURT: Or where you are.
>
> JUROR X: Okay.

---

[1] In order to avoid using the juror's actual name, and for ease of reference, we will refer to the juror as Juror X.

* * *

TRIAL COURT:   But this - - I'm a little confused - -

JUROR X:   Yeah, when they - - when they brought it, because it's not - - it is a family experience, but it didn't affect me because I was not born at the time that it happened.   But it was just - - So can I talk about what she said on the stand, the victim?   No, I can't.

TRIAL COURT:   No. No, I don't want you to go into your thought - - right now as far as being a member of the jury - - why do you want to be excused?

JUROR X:   Because I can't decide guilty or not guilty.

TRIAL COURT:   In any way, shape, or form?

JUROR X:   No.

TRIAL COURT:   So it's not just that - -

JUROR X:   Yeah, it's like - -

TRIAL COURT:   - - (indiscernible) than the others - -

JUROR X:   No.

TRIAL COURT:   So it's not just that - -

JUROR X:   Yeah, it's like - -

TRIAL COURT:   - - (indiscernible) than the others - -

JUROR X:   No.

TRIAL COURT:   - - or anything else - -

JUROR X:   It's just - - I cannot decide and I don't feel comfortable - - and I - - I thought that I would be comfortable, but I'm not.   It's like the last couple of days I haven't been able to sleep.

TRIAL COURT: Okay, just relax. So let me - - I need to - - I apologize, I need to ask you a couple of follow-up questions. Just relax, ma'am.

JUROR X: Thank you.

TRIAL COURT: Okay, in voir dire obviously you didn't bring it up.

JUROR X: Yes.

TRIAL COURT: Did you think it was not relevant to?

JUROR X: No, I did not think it - - it's not relevant to the case at all. What - - what it is. It's not relevant to the case at all. It didn't affect me in any shape or form. (Indiscernible) hold anything, like (indiscernible) or anything like that, or emotional thing. It was just - - I'm not okay with making a decision. You know, it's - - I can't talk about the case, but I'm not okay with making a decision. I'm just not, because - - it could go both ways and I'm not okay with making a decision.

TRIAL COURT: At all?

JUROR X: No.

TRIAL COURT: And this has - - this is not because - -

JUROR X: No it's just - -

TRIAL COURT: - - you agree or disagree with other jurors, it's - -

JUROR X: No.

TRIAL COURT: - - just emotionally you can't; is that what you're telling me?

JUROR X: No, it's not emotionally, because I don't feel like I'm emotionally connected; it's just - -

TRIAL COURT:   (Indiscernible)

JUROR X:   Yeah.   Because I don't want to make a decision with someone's life.   It's just - - I don't want to - - and I thought I would be able to and I thought that it - - but it's just - - actually when we sit down and deliberate I just - - I can't.

TRIAL COURT:   So - -

JUROR X:   And I can't discuss what we've discussed, so of course I can't.

TRIAL COURT:   But - - but this is what - - it's not - - this is - - there's - - there are two different things.

JUROR X:   Okay.

TRIAL COURT:   One is if you just feel you're different from the others and - - and that's a problem with you, or there's something about your makeup or whatever where the process is something you can't take part in, and I'm not sure what it is.   You know what I'm saying?

JUROR X:   It's - - it - -I don't know.   I - - I want to say it's the process of, you know, because I believe - - I partially believe stuff and then I partially don't believe stuff, and I can't make a decision.

TRIAL COURT:   So you feel that being part of a deliberating body is not what you should be doing?

JUROR X:   Yeah, I don't - - I don't - - no.   No.

TRIAL COURT:   If - - we went further - -

JUROR X:   Yes.

TRIAL COURT:   And without telling me what it is - -

JUROR X: Okay.

TRIAL COURT: - - because I don't care what it is. Okay?

JUROR X: Yeah.

TRIAL COURT: As you're deliberating with the jury, have you been able to voice an opinion - - I don't want - - I don't want to know whether he was not guilty or not guilty [sic], or are you still at the point where you're just saying - -

JUROR X: I've voiced my opinion. Yes.

TRIAL COURT: Okay. And what changed then?

JUROR X: I can't - - I can't say a hundred percent that she - -

TRIAL COURT: Okay, I don't want to - -

JUROR X: Okay. I'm sorry.

TRIAL COURT: Okay. So - - but I guess part of it is, if you just feel like you're not agreeing with the others - -

JUROR X: Yeah.

TRIAL COURT: - - then - - then basically - -

JUROR X: And I don't think it's that; it's just I'm not comfortable with making the decision.

TRIAL COURT: Because you're not agreeing with the others or because—

JUROR X: I don't - - I don't agree with the others.

TRIAL COURT: Okay. So - - and that's okay - -

JUROR X: Yes.

TRIAL COURT: - - and all that means is that you keep voting your way and

then it's a hung jury, that's it. If you can't reach a decision, you can't reach a decision.

JUROR X: Yeah.

TRIAL COURT: But you have to be able vote and that's my - -

JUROR X: Right.

TRIAL COURT: - - concern.

JUROR X: Yeah.

TRIAL COURT: Are you able to vote and keep your opinion, whatever it is?

JUROR X: I don't know. Like I thought I could do this before and obviously I can't and because - - I don't - - I don't know.

TRIAL COURT: Okay. It sounds like what you're telling me is you may have a different opinion than the others, whatever it is.

JUROR X: Yes.

TRIAL COURT: And because of that you're uncomfortable sticking to your opinion?

JUROR X: I don't know. I guess it - - it does make me uncomfortable, sticking to my opinion, because I can't say what theirs are, but because they're two different opinions.

TRIAL COURT: And that happens sometimes - -

JUROR X: Yeah.

TRIAL COURT: - - and sometimes that means it's just a hung jury. You can't reach a verdict.

JUROR X:   Yeah.

TRIAL COURT:   And that's okay (indiscernible) to tough it out and just say, "I don't agree with you."

JUROR X:   Yeah, and it - - I don't know - - I can't discuss what we discussed - -

TRIAL COURT:   Right.

JUROR X:   - - of course, but it was something that was said that made me just be like, "Okay, I don't want to - - I don't want to take - - partake in this."

TRIAL COURT:   Okay.

JUROR X:   I know, it puts you in a hard place - -

TRIAL COURT:   No, I'm just trying - - there are some situations where I can replace a juror - -

JUROR X:   Yes.

TRIAL COURT:   - - and there are other - - but that's - - that's very unusual.

JUROR X:   Yeah.

TRIAL COURT:   And there are other situations where I just have to say, "Look, you have to stick to your opinion, whatever it is," and like I said, I don't care what it is.

JUROR X:   Yeah.

TRIAL COURT:   But - -

JUROR X:   But I'm not a hundred percent sure of my opinion, that's the thing too.

TRIAL COURT:   So you're saying you can't vote either way?

JUROR X:   I guess.   I'm not sure.   I guess. Yeah.

TRIAL COURT:   Well, right now there's no agreement in the jury, that's all I know - - I mean - -

JUROR X:   No, there's no - - no.

TRIAL COURT:   Okay.   And because of that discussion, you are uncomfortable?

JUROR X:   I am confused.   I'm confused.   It's not that I'm uncomfortable; it's just I'm not comfortable - - I'm uncomfortable with saying - - can I say what I think, like - - like not guilty or guilty, or no?

TRIAL COURT:   No.

JUROR X:   Okay.   So. - -

TRIAL COURT:   But you're uncomfortable on saying your - - your position because of the others; is that it?

JUROR X:   No, it's not that.   It's that - - like side comments are made.

TRIAL COURT:   Okay.

JUROR X:   Can I say what - - what it is, but side comments were made. And it's not that - - I don't - - I don't - - I don't know.   It's just - - I feel like I'm so - - I can't say stuff that I want to say.

TRIAL COURT:   Okay.   I think you have - - at this point I think what you're telling is that it's difficult for you because you're not - - you're not happy with the way the other jurors are reacting to you.

JUROR X:   It's not just that.   It's just I can't say with my answer that I - - because we did a - - well, I can't say that.   Would my - - my opinion is

obviously different than everyone else's.

TRIAL COURT:   Okay.

JUROR X:   And my opinion is - - is not set in stone; it's just - - it's holes in this - - the situation that - - it - - it's just - - a testimony wasn't believable for me.   So that - - that's what it is, but it doesn't mean that the other - - the other testimony was believable.   If - - if that makes sense.

TRIAL COURT:   Right.   But if the - - what you're telling me is that you want to stick to your decision and you're uncomfortable with doing that.

JUROR X:   I don't know if I was - - I - - I guess so.

TRIAL COURT:   I mean, what - - you - - you want to leave.

JUROR X:   Yes.

TRIAL COURT:   But you swore to be a juror.

JUROR X:   Yeah, I know.

TRIAL COURT:   You know - - I don't - - I don't want to be - - I don't want to be mean.

JUROR X:   Yeah.

TRIAL COURT:   And you have to listen to both sides; you have to listen to the other people - -

JUROR X:   Yeah.

TRIAL COURT:   - - and then you have to make up your own mind.

JUROR X:   Yeah, and I'm not comfortable with making up my mind, if that makes sense.   I'm not comfortable saying it either way.

TRIAL COURT:   When you vote do you not - - do you not just vote?

JUROR X: No. I - - I did put - - I didn't actually put - - I don't know - - I can't - -

TRIAL COURT: No. (Indiscernible) Okay. Like, you know, sometimes you say how many guilty, how many not guilty - -

JUROR X: Yeah.

TRIAL COURT: If they ask that, I don't care which one it is, and I don't want to know which one it is for you; did you say I feel this way or that way or you were just saying, I can't do either one.

JUROR X: What I - - I'll say this way, but I also say I'm not a hundred percent certain also.

TRIAL COURT: Okay. So tell me in your own words why you want me to let you go.

JUROR X: I'm just not comfortable making a decision on guilty or not guilty.

Tr. p. 551-561.

{¶ 12} Thereafter, the trial judge exited chambers and consulted with the attorneys. The court informed counsel that Juror X had not given an adequate cause that supported excusing her, and that the court intended to inform the juror that she had to continue deliberating. The court also informed counsel that a note would be sent to the jury indicating that Juror X would not be excused. Both the prosecutor and defense counsel agreed with the trial court's decision. The court then returned to chambers where the following colloquy took place:

TRIAL COURT: Okay. Based upon me dealing with what we talked about

and talking to the lawyers, at this time I don't think you've given me an adequate reason to excuse you and put in a substitute.

JUROR X:   Okay.

TRIAL COURT:   So I'm going to ask the alternate to continue (indiscernible).

JUROR X:   Even though I can't make a decision?

TRIAL COURT:   At this point in time, I - - I - - what I heard you saying is that it was difficult, so - -

JUROR X:   Yeah.

TRIAL COURT:   - - see if you can.   Go back in there.

JUROR X:   All righty.

Tr. p. 565.

{¶ 13} The court also sent a note to the jury which stated that Juror X had "not given [the court] adequate reason to excuse her and substitute one of the alternates[,]" and that the jury should continue to deliberate.   Court's Exh. No. IV.   Sometime later, the jury sent the trial court another note which stated, "[Juror X] has stated she is still not capable of making a decision, and she has stated she will never be able to."   Court's Exh. No. V.   The trial court sent a note to the jury asking the foreman to ask Juror X whether she was willing to continue deliberating.   Thereafter, the foreman sent a note stating that she was "not willing to continue to deliberate.   She is stating she is not capable."   Court's Exh. No. VI.

{¶ 14} At that point, the trial court brought Juror X into chambers along with trial counsel.   The court again asked Juror X whether she was willing to continue to

deliberate. After the juror indicated that she was not, the trial court excused her. Defense counsel objected to the dismissal. The trial court noted the objection, but replaced Juror X with one of the alternate jurors.

**{¶ 15}** Following deliberations, the jury found Henderson guilty on all counts. A sentencing hearing was conducted in December 2018. Henderson asked the court to merge all of the counts for the purpose of sentencing. The court merged the kidnapping count with the rape (force or threat of force) count. The trial court then imposed a sentence of 10 years in prison on each count of rape, to be served consecutively. The trial court merged the counts for obstructing official business with the count for tampering with evidence, and it imposed a 24-month prison term thereon to be served consecutively with the sentences for rape. The trial court merged the counts for aggravated burglary, and the State elected to proceed on the aggravated burglary (deadly weapon) count; the court imposed a sentence of eight years for the aggravated burglary, to be served consecutively with the other convictions, for an aggregate prison term of 30 years.

**{¶ 16}** Henderson appeals.

## II. Show-Up Identification

**{¶ 17}** Henderson's first assignment of error states:

THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION TO SUPPRESS THE ONE-PERSON SHOW-UP IDENTIFICATION OF APPELLANT.

**{¶ 18}** Henderson contends that R.A.'s pretrial identification was not reliable, and, given this, the trial court erred by denying his motion to suppress.

{¶ 19} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." (Citation omitted.) *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994). Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ 20} In order to warrant suppression of identification testimony, the defendant bears the burden of showing that the identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" and that the identification itself was unreliable under the totality of the circumstances. *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). A show-up identification procedure, which involves showing just one individual to an eyewitness as opposed to a lineup of different individuals, is inherently suggestive. *State v. Martin*, 127 Ohio App.3d 272, 277, 712 N.E.2d 795 (2d Dist.1998). This "suggestiveness is exacerbated when the eyewitness is allowed to hear radio broadcasts indicating that the police have caught the perpetrator, and the police issue no disclaimer to the eyewitness that the person being exhibited may not be the perpetrator." *Id.* "Nevertheless, an individual show-up identification procedure may survive constitutional challenge if there is evidence that it is sufficiently reliable." *Id.* The Supreme Court has set forth certain factors to be considered in evaluating the reliability of a show-up identification, including the opportunity of the witness to view the criminal at the time of the crime, the witness's

degree of attention, the accuracy of the witness's description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Biggers* at 199. This court has "repeatedly held that one man show-ups which occur shortly after the crime are not per se improper, and that prompt on-the-scene show-ups tend to insure the accuracy of identification, involve a minimum intrusion, and support the prompt release of persons not identified." (Citation omitted.) *State v. Justice*, 2d Dist. Montgomery No. 23744, 2010-Ohio-6484, ¶ 17.

{¶ 21} Here, when Wolf interviewed R.A., she told him that she woke in her bedroom to see a man who threatened her with a knife. She indicated that, because her child was in her bed, she encouraged the man to go downstairs in order to protect the child from harm. She had the opportunity to view the perpetrator at close range in her bedroom and then as he went downstairs with her and proceeded to rape her. She described the perpetrator as a short, African-American male with shoulder-length dreadlocks, wearing a light blue shirt and jeans. R.A indicated to Wolf that she could identify him if she saw him again.

{¶ 22} Wolf testified that he arrived at R.A.'s residence approximately three minutes after being dispatched to the scene. He testified that it took approximately another two minutes to walk to her apartment. Wolf testified that the amount of time from when he first met R.A. to the actual show-up identification was approximately 25 to 30 minutes. R.A. immediately identified Henderson as the rapist and noted that he was wearing different pants. R.A. was certain of the identification. Wolf also testified that, even though R.A. heard the radio transmission that a suspect had been located, Wolf informed R.A. that the individual being detained might, or might not, be the perpetrator.

{¶ 23} The record demonstrates that R.A. had the opportunity to view Henderson during the commission of the offenses. She provided the police with an extremely accurate description of the perpetrator. The show-up occurred not long after the offense, and R.A. was certain of her identification. Viewing the totality of these facts and circumstances, we conclude that R.A.'s identification of Henderson was sufficiently reliable to be admissible despite the suggestiveness inherent in a one person show-up procedure. Thus, the trial court did not err when it denied Henderson's motion to suppress the pretrial identification. Accordingly, the first assignment of error is overruled.

### III. Expert Witness Certification

{¶ 24} Henderson's second assignment of error is as follows:

THE TRIAL COURT COMMITTED PLAIN ERROR BY CERTIFYING THE STATE'S EXPERT WITNESS IN THE PRESENCE OF THE JURY.

{¶ 25} Henderson contends the trial court erred by certifying, in the presence of the jury, that a witness for the State was an expert.

{¶ 26} The record shows that the State called Amy Dallaire, a forensic scientist, as a witness. The State asked Dallaire questions regarding her education, background, training and qualifications. Dallaire testified that she received her Bachelor of Science degree in biological sciences from Wright State University. She testified that she has worked at the Miami Valley Regional Crime Laboratory for the past sixteen years in the DNA/serology section. Dallaire testified that she undergoes yearly training and has two proficiency tests per year, which she has always passed. She also testified that her work is always peer-reviewed.

{¶ 27} Thereafter, the prosecutor stated, "the State would offer Amy Dallaire as an expert in the field of forensic scientist [sic], specifically as to serology and DNA." Tr. p. 362-363. The trial court then asked defense counsel whether he wished to cross-examine Dallaire as to her qualifications. When defense counsel declined, the trial court stated, "All right. I so designate her." *Id.*

{¶ 28} Dallaire went on to testify that R.A.'s DNA was found on the knife. She also testified that Henderson's DNA was not found on R.A.'s vaginal swab, but was found on R.A.'s rectal swab.

{¶ 29} Because Henderson did not raise an objection to the trial court's certification statement, he has waived all but plain error. *State v. Hilliard*, 1st Dist. Hamilton No. C-160263, 2017-Ohio-2952, ¶ 10. Plain error occurs when an error or defect at trial, not brought to the attention of the court, affects a substantial right of the defendant. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. Plain error exists when but for the error the outcome of the trial clearly would have been otherwise. *Id.* Courts must proceed on a claim of plain error "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of syllabus. The appellant bears the burden of affirmatively demonstrating error on appeal. *State v. Hayes*, 2d Dist. Montgomery No. 26379, 2016-Ohio-7241, ¶ 107.

{¶ 30} Although couched as an ineffective assistance of counsel claim, in *State v. Williams*, 2d Dist. Montgomery No. 27663, 2018-Ohio-1647, we addressed a similar situation and found no plain error. In *Williams*, after questioning its witness regarding his expert qualification, the prosecutor stated that the witness was tendered as "as an expert

in the field of firearms examination and tool marks." The trial court responded, "He'll be so designated." *Id.* at ¶ 16.

{¶ 31} As in *Williams*, we note that Henderson does not claim that Dallaire is not an expert in DNA. Additionally, the record supports her qualification to be considered an expert. Also, as in *Williams*, "[g]iven that the expert testimony at issue was largely perfunctory and uncontroversial, we fail to see how [the defendant] was prejudiced even if qualifying of [the] expert in front of the jury did enhance [her] stature and credibility." *Id.* at ¶ 18. Indeed, Dallaire's testimony that she did not find Henderson's DNA on the vaginal swab could be seen as corroborating his claim that he had consensual anal sex with R.A.

{¶ 32} Though we think the better practice is to avoid certifying an expert in the jury's presence, we conclude, on this record, that Henderson has failed to demonstrate plain error. The second assignment of error is overruled.

## IV. Manifest Weight

{¶ 33} The third assignment of error asserted by Henderson is as follows:
COUNTS 1, 2, 3, 4, AND 7 IN THE INDICTMENT MUST BE REVERSED BECAUSE THEY ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 34} Henderson contends that his convictions for rape, kidnapping and aggravated burglary are against the manifest weight of the evidence.

{¶ 35} "When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and

all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Hill*, 2d Dist. Montgomery No. 25172, 2013-Ohio-717, ¶ 8, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "A judgment should be reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 36} At trial, Henderson testified that he was in the vicinity of R.A.'s home in order to visit his girlfriend. He testified that when he arrived, his girlfriend was not home, so he went outdoors to smoke. Henderson testified that he observed R.A. sitting behind her townhome, so he walked over to speak to her. He testified that he knew R.A. as they had spoken four to six times since she had moved into the townhome. He testified that after about ten minutes, R.A. invited him into her home where they continued to talk. They entered the home through the rear sliding glass door. Henderson testified that after talking for approximately 15 additional minutes, he and R.A. engaged in consensual anal sex. According to Henderson, they heard a car approach; worried that it might be R.A.'s boyfriend returning home from work, Henderson exited the townhome through the rear door. He testified that R.A. opened the back sliding door both to let him in and out, and that he never touched the door.

{¶ 37} Henderson testified that he went back to his girlfriend's apartment after he left R.A.'s home. According to Henderson, he entered the building and walked up to the second floor where his girlfriend's apartment was located. He testified that he knocked

on her door but no one answered. At that point, a neighbor came out of his apartment. Henderson testified that the neighbor, upon learning that Henderson did not have a way to get home, offered to give him a ride home. He testified that, as they walked downstairs, he observed his girlfriend's book bag inside the building hallway at the bottom of the stairs. He testified that he picked it up in order to return it to her.

{¶ 38} Henderson testified that after exiting the building, he heard someone say, "hey." He testified that he did not recognize the voice so he kept walking toward the neighbor's car while the neighbor stopped and had a conversation with someone. He testified that he was hot, so he took off his shirt and used it to wipe his face. Henderson testified that he "started hearing feet quickly coming like that, and when [he] turned around, [he saw] a cop with a gun and another cop with a dog. And [he] took off running." Tr. p. 424. Henderson testified that he almost fell, at which time he dropped the bag and his shirt by the neighbor's car. Henderson testified that he did not have a knife.

{¶ 39} Henderson argues that his testimony and the lack of evidence demonstrated that his convictions were against the manifest weight of the evidence. Henderson's argument in support of this assignment of error essentially hinges upon his claim that his testimony was more credible because there was evidence that could be viewed as corroborating his version of events. Specifically, he notes that the State did not submit any evidence of his DNA other than from the swab taken from R.A.'s anus, which he claims corroborated his claim that they engaged solely in consensual anal sex. He also notes there was no sign of forced entry and that the State did not present evidence that his fingerprints were on the sliding glass door; he argues that these facts corroborated his claim that R.A. invited him into her home. He further notes R.A. was

calm when the police arrived at the scene, and that neither R.A. nor the S.A.N.E. nurse reported that R.A. suffered from facial, mouth, vaginal, or anal pain as a result of the encounter. Henderson argues that this again corroborated his testimony that the two engaged in consensual sex.

{¶ 40} However, this argument ignores other evidence presented by the State. First, R.A. testified that she was awakened in her bedroom by a man holding a knife. She testified that she had not locked the rear door after her boyfriend left for work. R.A. testified that the man took her downstairs where he proceeded to rape her vaginally and anally. She testified that while she was at the hospital being examined by the S.A.N.E. nurse, she noticed that she had a cut to her arm and a cut to her buttock. She noted that she had blood in her underwear. She testified that the cuts were not present prior to the attack. R.A. testified that she did not know Henderson and had never interacted with him in the past.

{¶ 41} The State also presented evidence that Henderson initially ran from the police, and that during the time the police could not see him, he took off his shirt and attempted to hide the shirt and knife.[2] The police subsequently found Henderson's shirt beside a knife, both of which were hidden behind bushes approximately eight feet from where Henderson was apprehended. The backpack he had been carrying was also found a few feet away.

{¶ 42} The State presented evidence that R.A.'s DNA was found on the knife blade. While Henderson's DNA and fingerprints were not found on the knife, the State

---

[2] "It is well established that evidence of flight from the scene of a crime, resisting arrest, escape, and the like are permissible as evidence of consciousness of guilt and, thus, of guilt itself." *State v. Frock*, 2d Dist. Clark No. 2004 CA 76, 2006-Ohio-1254, ¶ 57.

presented evidence that during a recorded jail telephone call between Henderson and a friend, Henderson stated that DNA could not be found on the type of knife handle the police found.

{¶ 43} The State also presented the testimony of an investigating detective who did note that he was not able to find fingerprints on the sliding glass door. However, he also testified that the door was covered in smudges. The detective testified that he did not attempt to test the door for DNA.

{¶ 44} The jury had the opportunity to observe all of the witnesses and the evidence presented at trial. The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of fact to resolve. *State v. McDonald*, 2d Dist. Montgomery No. 27237, 2017-Ohio-8496, ¶ 21, citing *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). " 'Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.' " *Id.*, quoting *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility "unless it is patently apparent that the trier of fact lost its way in arriving at its verdict." (Citation omitted.) *State v. Carpenter*, 2d Dist. Clark No. 2016-CA-66, 2017-Ohio-8905, ¶ 26.

{¶ 45} From this record, we cannot say that the convictions were against the

manifest weight of the evidence. Therefore, Henderson's third assignment of error is overruled.

## V. Juror Dismissal

Henderson's fourth and fifth assignments of error state:

THE TRIAL COURT ERRED BY INTERVIEWING THE JUROR WITHOUT

THE APPELLANT OR DEFENSE COUNSEL PRESENT.

THE TRIAL COURT ERRED BY DISMISSING A JUROR.

{¶ 46} Henderson contends that the trial court erred by preventing counsel from being present for and participating in the interviews of Juror X. He also claims that the trial court erred by ultimately dismissing Juror X. In support, he argues that the juror was not excused for a reason allowed by either Crim.R. 24 or R.C. 2945.29. He also argues that a criminal defendant has a right pursuant to the Fourteenth Amendment to be present at every "critical stage" of his trial. Henderson claims the removal of the juror resulted in prejudice because Juror X "was the only African-American on the jury" and because the record clearly demonstrates that she would have voted to acquit.

{¶ 47} R.C. 2945.29 states that "[i]f, before the conclusion of the trial, a juror becomes sick, or for other reason is unable to perform his duty, the court may order him to be discharged. In that case, if alternate jurors have been selected, one of them shall be designated to take the place of the juror so discharged." Similarly, Crim.R. 24(G)(1) provides for the use of alternate jurors if regular jurors "become or are found to be unable or disqualified to perform their duties." "[T]he substitution of an alternate juror for a regular juror for reasonable cause is within the prerogatives of the trial court and does not

require the consent of any party." *State v. Gaines*, 8th Dist. Cuyahoga No. 82301, 2003-Ohio-6855, ¶ 38, citing *United States v. Warren*, 973 F.2d 1304, 1308-1309 (6th Cir.1992). Whether a juror is unable to perform his duty is a determination that lies within the trial court's discretion. *State v. Gleason*, 65 Ohio App.3d 206, 210, 583 N.E.2d 975 (1st Dist.1989), citing *State v. Coleman*, 37 Ohio St.3d 286, 293, 525 N.E.2d 792 (1988).

{¶ 48} We first turn to the claim that the trial court erred by excluding Henderson's counsel from the first interview of Juror X and by denying him the right to question Juror X. This court has previously addressed a similar situation in *State v. Zaragoza*, 2d Dist. Montgomery No. 26706, 2016-Ohio-144, wherein we held that when "[t]he trial court did not discuss any legal issues, fact in controversy, applicable law, or other similar matter with [the juror, and] the trial court's communication with [the juror] was non-substantive, having nothing to do with the merits of [the defendant's] case[,] * * * any error in conducting the interview in private was, at worst, harmless." (Citation omitted.) *Id.* at ¶ 37.

{¶ 49} As in *Zaragoza*, the trial court in this case did not discuss any substantive issues with the juror. Instead, the trial court simply attempted to determine whether there was a basis for excusal. As a result of the first interview, the trial court decided not to dismiss Juror X. Obviously, Henderson does not take issue with this conclusion. Based upon *Zaragoza* and the facts of this case, we conclude that any error in failing to allow counsel into the first interview was harmless.

{¶ 50} Next, we address the claim that Juror X was dismissed for a reason not permitted by statute or rule. Specifically, Henderson claims that Juror X was not dismissed because she was unable to, or disqualified from, performing her duties. Instead, he contends the colloquy conducted during the first in camera interview

demonstrates that Juror X "simply did not want to" perform her duties.

{¶ 51} The "other reason" prong of the R.C. 2945.29 is not defined by the statute or criminal rule. However, courts have interpreted the "other reason" standard broadly. For example, courts have permitted dismissal of jurors for lying to the court and failing to return to court in a timely fashion. *State v. Miller*, 3d Dist. Crawford No. 3-03-26, 2004-Ohio-1947, ¶ 25; *Gleason*, 65 Ohio App.3d at 210, 583 N.E.2d 975. Other courts have upheld the dismissal of a juror who had an encounter with court spectators that led the juror to express anxiety and a juror who was physically restrained (by a disapproving husband) from appearing in court. *State v. Reid*, 2d Dist. Montgomery No. 19352, 2003-Ohio-4087, ¶ 16; *Coleman*, 37 Ohio St.3d at 293, 525 N.E.2d 792. Additionally, jurors have been excused for refusing to return to court due to a work conflict and for claiming that they were unable to look at pictures from a crime scene. *State v. Sales-Hilton*, 9th Dist. Summit No. 26351, 2012-Ohio-5651, ¶15; *State v. Hunt*, 10th Dist. Franklin No. 12AP-103, 2013-Ohio-5326, ¶ 72 and 73.

{¶ 52} Here, a review of the first colloquy between the trial court and Juror X, which spans 10 pages of the transcript, contains multiple statements by Juror X indicating that she did not want to participate in the process because she simply did not want the responsibility of deciding to vote for acquittal or a guilty finding. Indeed, Juror X's reasoning appeared to consist of a poorly-articulated hodgepodge of evolving reasons designed to cause her to be excused. As noted by the trial court, this reasoning did not justify excusing Juror X. However, when Juror X, despite the trial court's admonishments, continued to refuse to participate in deliberations, the court decided to excuse her. On this record, we cannot say that Juror X's refusal to deliberate falls

outside of the "other reason" provision for dismissing a juror, or that the trial court abused its discretion by dismissing Juror X.[3]

{¶ 53} We next turn to the claims of prejudice, and begin with the argument that Henderson was prejudiced because Juror X was dismissed despite the fact that she was the sole African-American on the jury. The record shows that prior to the first in camera interview of Juror X, the trial court stated the name of Juror X. Counsel and the court briefly discussed where the juror had been sitting during trial. Counsel for Henderson then stated, "If I'm recalling her correctly, I believe she's the only African-American on the jury, I believe." Tr. p. 550. The court responded, "She's not African-American. * * * I'm pretty sure she's not." *Id.* The trial court then interviewed Juror X and decided not to release her. Thereafter, the trial court again interviewed Juror X after the jury informed the court that Juror X would not deliberate. Following that second interview, counsel for Henderson stated, "I would note for the record that it appeared to me that [Juror X] is an African-American; she's the only African-American on the jury; we would object to her being dismissed for the record." Tr. p. 574. The trial court again responded that Juror X did not appear to be African-American. The prosecutor agreed with the trial court and asked counsel the basis for claiming Juror X is African-American. Counsel did not respond. Therefore, other than counsel's assertions, there is nothing in this record upon which we can determine the veracity of his claim regarding the juror's race.

{¶ 54} More importantly, the trial court found, and we agree, that even if Juror X was African-American, the issue was irrelevant. Henderson did not, and has not, raised

---

[3] Other than holding Juror X in contempt, we cannot ascertain any method that would result in compliance with the trial court's admonishment to join in the deliberations.

a constitutional argument in which he claims that Juror X was dismissed on the basis of her race. Nor does he raise a claim that her dismissal was a result of any action by the State intended to exclude her based upon her race. While Henderson may have preferred to retain Juror X on the jury because he thought she was African-American, that alone does not cause us to conclude that a constitutional right was implicated by Juror X's dismissal.

{¶ 55} We finally address the claim that Henderson was prejudiced because Juror X indicated she would vote to acquit. As stated above, it appears from the record that Juror X simply did not want to further deliberate. While she did appear to indicate that she did not agree with the other jurors, she also repeatedly stated that she could not make a decision one way or the other. Thus, we find no merit in this claim of prejudice.

{¶ 56} We conclude that the trial court acted appropriately in handling the issue of whether to excuse Juror X. And under these circumstances, we cannot say that the trial court abused its discretion by excusing the juror and replacing her with an alternate.

{¶ 57} The fourth and fifth assignments of error are overruled.

## VI. Consecutive Sentences

{¶ 58} The sixth assignment of error states as follows:

THE TRIAL COURT ERRED BY NOT CONSIDERING THE FACTORS OF SENTENCING AS SET FORTH IN R.C. 2929.14.

{¶ 59} Henderson contends that the trial court's imposition of consecutive sentences was not supported by the record.

{¶ 60} R.C. 2929.14(C)(4) states:

If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 61} "There are two ways that a defendant can challenge consecutive sentences on appeal. First, the defendant can argue that consecutive sentences are contrary to law because the court failed to make the necessary findings required by R.C. 2929.14(C)(4)." *State v. Adams*, 2d Dist. Clark No. 2014-CA-13, 2015-Ohio-1160, ¶ 17,

citing R.C. 2953.08(G)(2)(b) and *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 29. "Second, the defendant can argue that the record does not support the findings made under R.C. 2929.14(C)(4)." *Id.*, citing R.C. 2953.08(G)(2)(a) and *State v. Moore*, 2014-Ohio-5135, 24 N.E.3d 1197 (8th Dist.).

**{¶ 62}** Where, as here, the R.C. 2929.14(C)(4) findings are made, "an appellate court may not reverse the trial court's imposition of consecutive sentences unless it first clearly and convincingly finds that the record does not support the trial court's findings." *State v. Barnett*, 2d Dist. Montgomery No. 27660, 2018-Ohio-4133, ¶ 92, quoting *State v. Withrow*, 2d Dist. Clark No. 2015-CA-24, 2016-Ohio-2884, ¶ 38. "This is a very deferential standard of review, as the question is not whether the trial court had clear and convincing evidence to support its findings, but rather, whether we clearly and convincingly find the record fails to support the trial court's findings." (Citations omitted.) *State v. Cochran*, 2d Dist. Clark No. 2016-CA-33, 2017-Ohio-217, ¶ 7.

**{¶ 63}** Based upon Henderson's conduct and the emotional harm that R.A. suffered as a result of this conduct, we cannot find by clear and convincing evidence that the record does not support the R.C. 2929.14(C)(4) findings. Accordingly, the sixth assignment of error is overruled.

## VII.   Conclusion

**{¶ 64}** All of Henderson's assignments of error being overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, J., concurs.

DONOVAN, J., dissents:

{¶ 65} A juror cannot be removed if there is " 'any possibility' that fellow jurors' complaints about him or her are rooted in his or her view of the merits of the case." *State v. Robb*, 88 Ohio St.3d 59, 81, 723 N.E.2d 1019 (2000), quoting *United States v. Thomas*, 116 F.3d 606, 621 (2d Cir.1997). In my view, this is what occurred herein. Juror X (as the majority refers to her) did not indicate that she was unable to follow the law or unable to vote.

{¶ 66} There was no showing of physical/mental illness or outside influence rendering Juror X unable to deliberate. Nor was there any evidence she expressed a judgment about the case prior to deliberations. In fact, the record establishes that Juror X had participated in discussions regarding the evidence and voiced her opinion. It is a fundamental principle of our jury system that "once banded together, a jury should not be discharged until it ha[s] completed its solemn task of announcing a verdict." *Crist v. Bretz,* 437 U.S. 28, 36, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978). This critical tradition is enshrined in the Fifth and Sixth Amendments, which protect "the defendant's valued right to have his case completed by a particular tribunal." *Id.*

{¶ 67} I cannot say with conviction that Juror X's dismissal stemmed from something other than her "view of the government's evidence." *U.S. v. Brown*, 823 F.2d 591, 597 (D.C.Cir.1987). Juror X expressed permissible reservations about the sufficiency/credibility of the evidence. Included within the guarantee of a fair trial and impartial jury is the guarantee that a holdout juror will not be excused for failure to deliberate where there is some evidence that the juror simply disagrees with the other

jurors about the merits of the case. As multiple courts have made clear, "[w]henever it appears that a jury may be reconstituted in order to reach a particular result, the guarantee of a fair and impartial jury is meaningless to a defendant and creates unwarranted mistrust and suspicion among members of the public." *Garcia v. People*, 997 P.2d 1, 8 (Colo.2000); *see also State v. Elmore*, 121 Wash.App. 747, 756, 90 P.3d 1110 (2004). It appears on this record that the removal of Juror X may well have been done in order to avoid a hung jury. Even had it been justified to remove Juror X in this fashion, "removal should [have been] accompanied by an instruction that removal in no way reflected approval or disapproval of the view expressed by the juror." *Riggs v. State,* 809 N.E.2d 322, 329 (Ind.2004).

{¶ 68} It should be emphasized that this record does not establish that Juror X was unable to follow the law, unwilling to vote, and/or was unfit. Rather, the record before us discloses a possibility, and a reasonable one, that the impetus for Juror X's dismissal stemmed from her view of the merits of the case. There is no reason personal to Juror X established on this record for her removal. No misconduct or partiality was established. Rather, the record reveals that the reasons were seemingly related to the issues of the case and/or her relationship with the other jurors. "In a competition between jury secrecy, the existence of a holdout, and the potential for the technical existence of some form of juror misconduct, the holdout's interests and the secrecy of the deliberations must win every time." Jason D. Reichell, *Standing Alone: Conformity, Coercion, and the Protection of the Holdout Juror,* 40 U.Mich.J.L.Reform 569, 617-618 (2007).

{¶ 69} Significantly, during the initial venire of Juror X conducted by the trial court,

the following exchange occurred:

> TRIAL COURT: As you're deliberating with the jury, have you been able to voice an opinion – I don't want – I don't want to know about whether he was not guilty or not guilty [sic], or are you still at the point where you're just saying –
>
> JUROR X: I've voiced my opinion.   Yes.
>
> TRIAL COURT: Okay.   And what changed then?
>
> JUROR X: I can't – I can't say a hundred percent that she [sic] –
>
> TRIAL COURT: Okay, I don't want to –
>
> JUROR X: Okay.   I'm sorry.
>
> TRIAL COURT: Okay.   So – but I guess part of it is, *if you just feel like you're not agreeing with the others* –
>
> JUROR X: *Yeah.*
>
> TRIAL COURT: -- then – basically –
>
> JUROR X: And I don't think it's that; it's just I'm not comfortable with making the decision.
>
> TRIAL COURT: *Because you're not agreeing with the others or because* –
>
> JUROR X: *I don't – I don't agree with the others.*
>
> * * *
>
> TRIAL COURT: -- and all that means is that you keep voting your way and then it's a hung jury, that's it.   If you can't reach a decision, you can't reach a decision.[4]

---

[4] This statement even suggests to Juror X that if a decision (hers or the panels) cannot

* * *

TRIAL COURT: Okay. It sounds like what you're telling me is you may have a different opinion than the others, whatever it is.

JUROR X: *Yes.*

Tr. p. 555-557.

{¶ 70} Based upon the foregoing exchange, it is evident that Juror X's issue with deliberating was "rooted in her view of the merits of the case." In fact, the entirety of this initial exchange does not bear out the foreman's note that a "family experience" of Juror X was the impediment to ongoing deliberations. This suggestion was almost immediately dispelled, yet the court continued its intrusive questioning of Juror X. I recognize that a juror's holdout status does not absolutely prevent dismissal, but the court must first conclude there is no reasonable possibility that the true impetus for dismissal is the juror's view of the evidence.

{¶ 71} This case illustrates that the discharge of a deliberating juror is a sensitive undertaking and is fraught with the potential for error. It should be done with special precautions, lest the sanctity of jury deliberations be too readily compromised. Once it was determined that Juror X was in fact deliberating, the inquiry should have ended. Notably, Juror X never voiced privately and of her own volition a desire to be removed by the trial judge when the issue first arose. Juror X merely voiced dissension and discomfort. Nevertheless, the court continued questioning her and compromised the secrecy of jury deliberations. The effect of the 10-page inquiry by the trial court without

---

be reached, it will be a mistrial, not that she will be removed. These comments constitute an ex parte comment on the law to the singular target juror.

counsel may have rendered Juror X especially reluctant to express herself freely in the juror room when her "problem" was subject to such judicial scrutiny.

{¶ 72} Significantly, without explanation or justification by the trial judge, counsel was not permitted to participate in or observe the lengthy and overly-expansive initial questioning of Juror X, conducted by the trial judge. "As a general rule, any communication with the jury outside the presence of the defendant or parties to a case by either the judge or court personnel is error which may warrant the ordering of a new trial." (Citations omitted.) *State v. Schiebel*, 55 Ohio St.3d 71, 84, 564 N.E.2d 54 (1990). " 'Such communications are required to be made in the presence of the defendant or parties so that they may have an opportunity to be heard or to object before the judge's reply is made to the jury.' " *State v. Rucker*, 2d Dist. Montgomery No. 24340, 2012-Ohio-4860, ¶ 42, quoting *Bostic v. Conner*, 37 Ohio St.3d 144, 149, 524 N.E.2d 881 (1988). The majority suggests no legal issues were discussed with Juror X, but the trial court in fact twice advised Juror X about hung juries in contravention of *Zaragoza,* 2d Dist. Montgomery No. 26706, 2016-Ohio-144.

{¶ 73} It is also important to note that after the trial court conducted its initial intrusive questioning of Juror X, Juror X dutifully returned to the jury room to continue her service without incident as a member of the jury. Failing to return is a sufficient basis to remove a juror in Ohio. *Gleason*, 65 Ohio App.3d at 210, 583 N.E.2d 975 (1st Dist.1989) (replacing a juror who failed to appear to avoid a delay in the proceedings is not an abuse of discretion); *State v. Sales-Hilton*, 9th Dist. Summit No. 26351, 2012-Ohio-5651, ¶ 15 (court was left with "little choice" in replacing a juror with an alternate after juror refused to return to court). The fact that Juror X dutifully resumed service exhibited a willingness

to continue service and perform her duties even if she did not agree with the majority of the jurors, desiring to hold on to honest conviction as to the merits of the case. A juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate simply because the juror expresses the belief that further discussion will not alter his or her views. *See People v. Castorena*, 47 Cal.App.4th 1051, 1066-1067, 55 Cal.Rptr.2d 151 (1996). It is relevant that, when requesting a mistrial, defense counsel noted that it was the afternoon of the second day of deliberations. Tr. p. 576.

{¶ 74} Additionally, counsel was not permitted to make a record regarding the race of Juror X, given evidence that not only did she not share the view of the other jurors but she had concerns regarding statements made during deliberations by her fellow jurors. Defense counsel was an African-American male, and he indicated to the trial judge (a Caucasian female) that he believed Juror X was African-American as well. The trial court, however, refused to permit Juror X's race to be placed on the record. Instead, the trial court, without asking Juror X, indicated on the record that she *believed* Juror X was not an African-American. Although the majority suggests that the defendant's attorney provided no rationale for his assertion that Juror X was African-American, the record reflects that he was twice cut off by the trial court when attempting to offer the basis for his contention. Jurors fairly drawn from the community are "critical to public confidence in the fairness of the criminal justice system." *Taylor v. Louisiana,* 419 U.S. 522, 530, 95 S.Ct. 692, 42 L.Ed. 2d 690 (1975).

{¶ 75} Significantly, the delicate issue of the ultimate removal of Juror X was erroneously sent back to the foreman himself after the second note, for him to make a

pivotal inquiry of Juror X. Not only is this highly irregular, but it may have further cemented the divide between the dissenting juror and the foreman, as spokesman for the majority. Ostensibly, the foreman asked this pivotal question in the presence of all the other jurors with whom Juror X had already expressed disagreement. This misstep opened the door for the foreman to influence the continuation of the deliberative process. The second note should have prompted a single query by the court, "Are you deadlocked?" When the foreman's original suggestion that Juror X's family experience prevented her from deliberating was proven baseless, care should have been taken to guarantee his second missive did not merely mask a desire to break a deadlock.

{¶ 76} The court (not the foreman) could have pointedly asked whether her reason to be removed concerned a personal matter – such as illness or a family problem – unrelated to deliberations, and if Juror X had said yes, the court would have been justified in removing her. Juror X had deliberated, and nothing required her to deliberate for a particular period of time. If the trial court had the discretion to launch a second inquiry, knowing Juror X had deliberated, as the court did here "the threat of the interview with the judge could be used by those jurors who seek to convince a holdout to go along with the majority's position." Nancy S. Marder, *The Myth of the Nullifying Jury,* 93 Nw. U.L. Rev. 877, 950 (1999).

{¶ 77} Furthermore, when the "problem" juror was initially questioned, she should have been informed that she could not be discharged unless she had a personal problem unrelated to her relationship to her fellow jurors or her views on the case. Great care must be taken to ensure a lone dissenting juror is not permitted to evade her responsibilities. Such care is not established here.

**{¶ 78}** The instant case is unlike *State v. Segines*, 8th Dist. Cuyahoga No. 89915, 2008-Ohio-2041, wherein the Eighth Appellate District held that a trial court did not abuse its discretion in replacing a juror with an alternate where the original juror was observed laughing inappropriately, exhibiting odd behaviors, and was not forthcoming as to her true address. *Id.* at ¶ 66. Other jurisdictions have found the removal of a juror permissible when the juror threatens or intimidates other jurors and disrupts deliberations. *Shotikare v. United States*, 779 A.2d 335, 340 (D.C.2001). Furthermore, in *State v. Arnold*, 280 Ga. 487, 629 S.E.2d 807 (2006), it was held that a trial court did not abuse its discretion in removing a juror who cursed at other jurors and actively humiliated them through the use of vindictive personal attacks such as calling them "stupid" and "monkeys." *Id.* In the instant case, nothing like these legitimate reasons for removal was reflected in the record. There was not a hint of misconduct or partiality. It is a legitimate concern that the successive notes masked disagreement between the target juror and the rest of the panel.

**{¶ 79}** Unquestionably, Juror X was entitled to maintain her position and not continue to discuss the evidence. "A failure to agree, however unreasonable, is grounds for a mistrial, not removal of the obstacle to unanimity." *United States v. Hernandez*, 862 F.2d 17, 23 (2d Cir.1988) ("That a juror may not be removed because he or she disagrees with the other jurors as to the merits of the case requires no citation."). "Removal of a juror for deliberate misconduct requires more than a refusal to negotiate further." *Riggs*, 809 N.E.2d 322, 328 (Ind.2004).

**{¶ 80}** Clearly, there were fundamental Fifth and Sixth Amendment rights under both the Ohio and U.S. Constitutions which were at play in Juror X's removal. The

manner in which Juror X was removed implicated both Due Process under the Fifth Amendment and juror unanimity under the Sixth Amendment. As the standard Ohio Jury instruction makes clear, "you need not surrender honest conviction in order to be congenial or to reach a verdict solely because it's the opinion of the jury." 4 Ohio Jury Instructions 106, Section 413.70 (2003). A physical or mental illness that renders a juror *unable to deliberate* would be an adequate reason for removal. Emotional angst caused by disagreement and harsh give and take is not. There is a real possibility Juror X was dismissed as much for failing to agree with the majority as for failing to participate in deliberations.

{¶ 81} A high standard should and does exist for removing a juror after deliberations have begun. I am concerned that in this case a conviction was secured unfairly, that is, the manner in which Juror X was removed appears to have facilitated the rendering of a guilty verdict. Even if not the case, such appearance has the potential to erode public trust and confidence in our criminal justice system. A criminal defendant has a "valued right" to have his or her guilt or innocence determined by the jury to which the prosecutor's case is first presented. *United States v. Jom*, 400 U.S. 470, 484, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971).

{¶ 82} Accordingly, I would reverse.


Copies sent to:

Mathias H. Heck, Jr.
Michael P. Allen
Travis Kane
Hon. Barbara P. Gorman