Plaintiff-appellant the State of Ohio appeals from an order suppressing eyewitness identification obtained as a result of a show-up occurring ten minutes after a robbery. The State contends that the trial court erred by finding that the evidence of the reliability of the eyewitness identification procedure was insufficient to overcome its suggestive nature. From our view of the transcript, we conclude that the evidence in the record supports the trial court's conclusion. Accordingly, the judgment of the trial court is Affirmed.
 I
On December 26, 1996, about 5:45 p.m., Dayton police officer Roger Pittman observed a man bent over James Martin, "reaching into his back pocket." Pittman saw the man take something from Martin's person, and run. Pittman did not see the man's face. Pittman described the lighting conditions as being dusk, getting toward dark. However, it was light enough that Pittman could see what the suspect was wearing; it was not totally dark.
Pittman gave chase, but was unable to catch the suspect. Within two or three minutes, Pittman had abandoned the chase, and returned to talk to the victim, James Martin. Martin said that the robber had come upon him from behind, and had pushed him to the ground. James Martin gave Pittman a clothing description.
As Pittman was putting James Martin in the back seat of his cruiser, he saw a suspect, wearing the same type of clothing, at the corner of Oak and Nathan. Pittman got on the radio and told other crews "that the robbery suspect was going North on Nathan."
Some time later, Pittman radioed that the suspect was running east on Park Drive. Officer Coberly radioed that he had stopped "a suspect" at Park Drive and Alberta. James Martin testified that he remembered being in the cruiser and hearing things come over the radio.
Pittman drove to Park Drive and Alberta, with James Martin in the back seat. Coberly had an individual handcuffed. When Pittman saw the suspect's face, he recognized him as the defendant-appellee, Nirvana Martin, who was previously known to him. Pittman then testified as follows:
 I then had Mr. Martin in my back seat, I.D. Standing outside the vehicle, I shined my overhead lights from the cruiser on Nirvana Martin. And he got out. I asked him if this was the individual. And he said, yes, it was. I asked him twice. And he said it was.
Pittman testified that James Martin did not hesitate in identifying Nirvana Martin as the robber.
On cross-examination, Pittman acknowledged that there had been some discussion over the radio about having seen Nirvana Martin in the area earlier, similarly dressed, and that Nirvana Martin was mentioned by name in this discussion over the radio. Pittman also acknowledged that after Nirvana Martin had been apprehended by the other officers, the phrase, "we've got him," came over the radio.
Pittman testified that it was less than ten minutes from the time he observed the Robbery taking place to the time of the show-up and identification.
James Martin was called by the defense to testify at the suppression hearing. He testified that:
 Somebody came up behind me and cracked me in the head and pushed me down. I know that he rolled me over, took my money, every penny I had.
At first, James Martin was not sure whether Pittman had put him in the back of his cruiser, but felt that Pittman had. The following exchange then occurred:
 Q. If I told you the police officer said they put you in the car, would you dispute that?
A. No.
Q. Okay.
 A. `Cause I will go along with whatever they say because usually the police are right.
Nirvana Martin was arrested and charged with Robbery. He moved to suppress James Martin's eyewitness identification testimony, upon the grounds that it was obtained as a result of a suggestive procedure. Following the hearing, the trial court found Nirvana Martin's motion to be well-taken, and granted the motion to suppress. From the trial court's suppression order, the State appeals.
 II
The State's sole Assignment of Error is as follows:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF THE STATE OF OHIO AND ABUSED ITS DISCRETION BY FINDING THAT THE COMPLAINANT'S SHOW-UP IDENTIFICATION OF APPELLEE WAS IMPERMISSIBLY SUGGESTIVE.
Both parties and the trial court cite Neil v. Biggers (1972),409 U.S. 188, 93 S.Ct. 375. In that case, the United States Supreme Court held that even though a show-up identification, involving the exhibition of just one individual to an eyewitness, as opposed to a lineup, is suggestive, it may, nevertheless, not offend constitutional due process if, under the totality of the circumstances, the identification is reliable. The Supreme Court held that the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. Id., at 199.
In Neil v. Biggers, supra, the Supreme Court held that the show-up procedure in that case was reliable. The witness had previously been shown numerous suspects, some in lineups and others in show-ups, and had been shown between thirty and forty photographs. She told the police that a man pictured in one of the photographs had features similar to those of her assailant, but identified none of the suspects. This occurred over a period of seven months. When the police called her down to the police station to view yet another suspect, who was being detained on another charge, the police made an effort to construct a suitable lineup, but found no one fitting the suspect's unusual physical description, so they conducted a show-up instead. The victim in that case had been raped at knifepoint, and testified that she had had two opportunities to observe her assailant's face, one in artificial light inside her home, and the other, later, outdoors in the light of a full moon. Furthermore, she had heard her assailant say, "shut up or I'll kill you." At her request, the suspect in the show-up was asked to repeat those words. Finally, the victim testified that she was sure of her identification:
 A. That I have no doubt, I mean that I am sure that when I — see, when I first laid eyes on him, I knew that it was the individual, because his face — well, there was something that I don't think I could ever forget. I believe —
 Q. You say when you first laid eyes on him, which time were you referring to?
 A. When I identified him — when I seen him in the courthouse when I was took up to view the suspect.
Neil v. Biggers, supra, at 196-97.
In the case before us, the show-up occurred within ten minutes after the criminal act, as opposed to the seven months that elapsed in Neil v. Biggers, supra. In that respect, there would be reason to believe that the identification in the case before us is more reliable, since there was less time for the witness's memory to fade. However, in many other respects, the identification in the case before us was less reliable.
In the case before us, unlike in Neil v. Biggers, supra,
there is no evidence that the eyewitness even had an opportunity to observe the perpetrator's face, let alone that that opportunity was extensive, and of good quality. Also, the victim in Neil v.Biggers, supra, had described the perpetrator as "being fat and flabby with smooth skin, bushy hair and a youthful voice," and as being between 16 and 18 years old and between 5'10" and 6' tall, as weighing between 180 and 200 pounds, and as having a dark brown complexion. Id., at 194. By contrast, in the case before us, the victim had given the police no description beyond a clothing description.
In Neil v. Biggers, supra, the victim testified that she was sure of her identification because there was something about his face that she could not forget. By contrast, in the case before us, the victim gave no reason for his confidence in his identification.
Finally, and perhaps most importantly, in the case before us there was not only a strong suggestion, through the circumstances being communicated over the radio, which was overheard by the victim, that the police had caught the perpetrator and were holding him for the victim to identify, but also reason to believe that the victim was unusually susceptible to suggestion. In this regard, the trial judge noted in her decision: "the victim displayed a particular susceptibility to suggestion by authority figures as evidenced by his manner of testifying at the hearing and his inability to recall details, including but not limited to
the statement that he `. . . will go along with whatever they say because usually the police are right.'" (Emphasis added.) By contrast, in Neil v. Biggers, supra, there is nothing in the record to indicate that the police had communicated to the victim any confidence that they had found the perpetrator, and the victim's repeated non-identification of suspects, despite the fact that she told the police that one man pictured in one of the photographs had features similar to those of her assailant, is indicative of her lack of susceptibility to suggestion. In the case before us, the trial judge had an opportunity to observe the demeanor of the victim, who testified that he was afflicted with both epilepsy and cerebral palsy, although he testified that, to his knowledge, those conditions did not affect his ability accurately to observe and recall events. In assessing the reliability of the victim's eyewitness identification in this case, it is appropriate that we give some deference to the trial judge, who observed the victim testify, and concluded therefrom that he had a particular susceptibility to suggestion by authority figures.
A show-up identification procedure, as opposed to a well-conducted lineup identification procedure, is inherently suggestive. Its suggestiveness is exacerbated when the eyewitness is allowed to hear radio broadcasts indicating that the police have caught the perpetrator, and the police issue no disclaimer to the eyewitness that the person being exhibited may not be the perpetrator. Nevertheless, an individual show-up identification procedure may survive constitutional challenge if there is evidence that it is sufficiently reliable. In the case before us, we are satisfied that there is evidence in the record from which the trial court could find, as it did, that the show-up identification procedure was not sufficiently reliable to withstand constitutional challenge.
The State's sole Assignment of Error is overruled.
 III
The State's sole Assignment of Error having been overruled, the judgment of the trial court is Affirmed.
YOUNG, P.J., and GRADY, J., concur.
Copies mailed to:
Steven J. Ring
Arvin S. Miller
Hon. Mary Donovan