OPINION
Defendant-appellant Jermaine Sherls appeals from his conviction for Aggravated Robbery. He contends that the trial court erred by denying his motion to suppress eyewitness identifications. He also contends that his conviction is against the manifest weight of the evidence.
We conclude that the trial court properly denied the suppression motion, and that its judgment is not against the manifest weight of the evidence. Accordingly, the judgment of the trial court is Affirmed.
 I
At approximately 2:00 a.m. on June 30, 2000, Bryan Simpson drove his friend, Kanisha Goff, from her place of work to her home at the Chevy Chase apartment complex in Centerville. Goff exited Simpson's car and walked to her apartment as Simpson was collecting his belongings from the car. As Simpson began to walk toward Goff's door, a black male approached him, pulled a gun and placed it against Simpson's head. Goff immediately screamed and ran around the side of the building.
The male told Simpson to "peel," a slang term for "give me everything you got." He then cocked the gun, put it back to Simpson's head and said, "you think I'm playin'?" In response, Simpson retrieved his wallet and attempted to take his money out. However the gunman ordered him to drop it on the ground. The gunman then took the wallet and ran off. Shaken, Simpson got in his car and drove off. Realizing that he needed to report the incident, he was able to locate an officer and give a description of the assailant.
Around the same time, Beth Meyers and Nichole Moyer were inside Moyer's apartment at Goff's apartment complex when they heard two knocks and a scream for help. They looked out the peephole of the apartment, but saw nothing. Meyers then went out to her car to retrieve some of her belongings. As Meyers looked through her car, Moyer claimed to see a "shadow." Meyers walked toward the shadow when a black male jumped out from behind a car. The man, who held a handgun, said "don't fuck with me, bitch." He held the gun sideways at Meyers, then pointed it at Moyer and then back at Meyers. He then ran off. Meyers and Moyer returned to the apartment and called the police. When the police responded, they gave a description of the assailant.
In the meantime, between 2:30 and 3:00 a.m., another officer was on patrol in Centerville when he noticed an unusually large crowd of people in the parking lot of a local club. When he approached the crowd, he was informed that someone had fired a gun. The crowd pointed to a car that was traveling west away from the club. It was the only vehicle traveling in that direction. The officer performed a felony stop of the vehicle, and with his gun drawn, ordered the driver out of the vehicle and onto the ground. The driver exited the car and, despite the officer's orders to get down, continued to walk toward the officer. At the same time, the passenger of the car, Sherls, exited the car and laid down on the passenger side. When back-up arrived, a handgun was observed partially under the car on the passenger side.
Shortly thereafter, the officers learned that the Centerville police were investigating the incidents involving Simpson and Meyers. The officers with Simpson were informed that the other officers had two people in custody who matched the description given by Simpson and Meyers. An officer then drove Simpson and Goff to the location where Sherls was stopped. Simpson was told that he would have to determine whether either man had robbed him. The driver of the car was removed from the police cruiser first. Simpson immediately stated that he was not the assailant. When Sherls was then removed from the cruiser, Simpson emphatically and immediately identified him as the assailant.
Approximately one week later, Detective Daniel Osterfeld went to Moyer's apartment with a photo spread. He first took Meyers to his cruiser to observe the array. Meyers identified Sherls as the man with the gun outside Moyer's apartment. Osterfeld then took Moyer to his cruiser. Moyer could not make a positive identification; however, she picked out two photos as resembling the man outside her apartment.
Sherls was indicted on July 24, 2000, on two counts of Aggravated Robbery, in violation of R.C. 2911.01(A)(1), with firearm specifications, with regard to Simpson and Goff. He was also indicted on one count of Carrying a Concealed Weapon, in violation of R.C. 2923.12(A).
At trial, Sherls moved for, and was granted, a judgment of acquittal, pursuant to Crim.R. 29, on the charge of Aggravated Robbery pertaining to Goff. He entered a plea of guilty to the charge of Carrying a Concealed Weapon. That charge was not mentioned to the jury. Sherls presented alibi testimony from an acquaintance, Hasani Adams, who testified that he was with Sherls at the time Simpson was robbed and Meyers was accosted. Following the trial, Sherls was convicted on the remaining count of Aggravated Robbery, with a firearm specification. He was sentenced accordingly. From that conviction and sentence he now appeals.
 II
The First Assignment of Error is as follows:
 THE TRIAL COURT ERRED WHEN IT FAILED TO SUSTAIN THE DEFENDANT'S MOTION TO SUPPRESS THE IDENTIFICATION TESTIMONY.
Sherls challenges the trial court's decision overruling his motion to suppress the show-up and photo identifications and their subsequent admission at trial.
We begin with the show-up identification made by Simpson. Sherls contends that the identification was unreliable because Simpson was told by the police that a suspect was in custody who fit the description.
To warrant suppression of identification testimony, the accused bears the burden of showing that the identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" and that the identification itself was unreliable under the totality of the circumstances. Neil v. Biggers (1972), 409 U.S. 188, 199. "A show-up identification procedure, as opposed to a well-conducted lineup identification procedure, is inherently suggestive." State v. Martin (1998), 127 Ohio App.3d 272, 277. "Its suggestiveness is exacerbated when the eyewitness is allowed to hear radio broadcasts indicating that the police have caught the perpetrator, and the police issue no disclaimer to the eyewitness that the person being exhibited may not be the perpetrator." Id. "Nevertheless, an individual show-up identification procedure may survive constitutional challenge if there is evidence that it is sufficiently reliable." Id. The Supreme Court set forth certain factors to be considered in evaluating the reliability of a show-up identification, including the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. Neil v. Biggers, supra, at 199.
In this case, Simpson had approximately one and one-half minutes to view Sherls who was only "about a foot or less" away from him at the time. Simpson testified that he paid attention to Sherls's face, which was facing the light from the apartment, during the entire confrontation because he was afraid that Sherls was going to shoot him. Simpson gave a description to the police of a black male, shorter than himself, thin build, short hair cut, wearing a tee shirt and jeans. Simpson also noted that the perpetrator had high cheek bones, full lips and small ears that "stuck out."
Simpson testified that the police officer he was with "got some calls on his radio, said that they had got some people who had been at Diamonds and was shooting into the air or something * * * and that they might be the same people." Simpson was taken to the show-up within approximately thirty minutes of the crime. The police had two suspects for the show-up, rather than just one. He was told that he would have to determine whether either man was his assailant. Simpson was able to immediately say that the first individual shown was not the perpetrator, and that Sherls, the second person shown, was the man who had robbed him. Simpson testified that he was careful about the identification because he did not want to send an innocent person to jail. He also testified that his identification was based upon Sherls's facial features.
We conclude from a review of the record that the show-up procedure, as described by Sherls and the officer who took him to the show-up, did not give rise to a substantial likelihood of irreparable misidentification.
We next turn to the photo array identifications made by Myers and Moyer. Sherls contends that neither identification was reliable because the women saw the perpetrator for no more than thirty seconds.
In State v. White (Feb. 2, 1994), Clark App. No. 3057, unreported, this court addressed the issue of suggestive photographic confrontations:
 In many cases, and in almost all cases in which the criminal offender is not known to his victim or other eyewitnesses and is not arrested at the time of the crime, those who witness the crime are asked to identify the perpetrator for purposes of police investigation through some form of confrontation. This confrontation may be in the form of a "lineup," a one-on-one "show up," or from a photograph or series of photographs displayed to the witness. When any of these systems of confrontation suggest, due to the manner or mode of their presentation, that one individual is more likely than others to be the perpetrator of the crime, that fact increases the likelihood of misidentification and violates the right to due process of law of a defendant so identified. Identification testimony that has been tainted by an unduly or unnecessarily suggestive out-of-court confrontation may be suppressed on that basis.
 However, even when a confrontation is unnecessarily or unduly suggestive, the identification testimony derived from the confrontation is not inadmissible solely for that reason. Reliability of the testimony is the linchpin in determining its admissibility. So long as the identification possesses sufficient aspects of reliability, there is no violation of due process.
 Reliability is determined from the totality of the circumstances. These circumstances include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself. The foregoing due process concerns are implicated only if and when a confrontation is unnecessarily or unduly suggestive. That prospect usually arises when the witness has been shown but one subject, whether in a "showup" * * * or a single photograph * * *. Similarly, if the witness is shown pictures or photographs of several persons in which the photograph of one recurs or is in some way emphasized, undue suggestion may occur. However, even when the confrontation process is unduly or unnecessarily suggestive, the later identification testimony should not be excluded so long as the identification itself is reliable.
Id., citations omitted.
The officer who presented the photo array to the eyewitnesses did nothing to suggest a particular picture. At trial, he described his procedure for compiling the photo array and for presenting it to the victims. He chose pictures of individuals from the Montgomery County computer system who had the same or similar characteristics as Sherls and as described by the eyewitnesses. When presenting the photo arrays to the eyewitnesses he read the "Photographic Show-up Instructions." Each eyewitness indicated their understanding of the instructions.
We have viewed the photographic array. It consists of pictures of six black males who appear to be about the same age and build. All of the subjects have similar short hair cuts. There is nothing about the array that is suggestive, let alone unduly suggestive. In fact, we find this photo array to be exemplary because of the apparent care taken to create a line-up composed of individuals who are similar in appearance.
Even had the array been unduly suggestive, the circumstances of this case indicate that Myers' identification of Sherls was itself sufficiently reliable. Myers stated that she had made her photo selection based upon the features she observed on the perpetrator. She chose Sherls's photograph quickly and without any difficulty. Therefore, we cannot say that the trial court erred in permitting the State to introduce her pre-trial identification of Sherls.
Since there was nothing suggestive about the array, and Moyer also had an adequate opportunity to view Sherls during the confrontation, we cannot say that the trial court erred in permitting the State to introduce her identification. We note that the two individuals chosen by Moyer are strikingly similar in features. She testified that she had been unable to choose between the two pictures in the photo array because both men had features similar to the features she had observed during the confrontation. Moyer positively identified Sherls at trial.
We find that the eyewitnesses' identifications, under the totality of the circumstances, are inherently reliable and therefore the trial court did not err in denying Sherls' motion to suppress. All eyewitnesses had the opportunity to view the suspect at a relatively close range. In reviewing the circumstances surrounding the identifications of Sherls in this case, we are not convinced that there was "a very substantial likelihood of irreparable misidentification." Furthermore, all of the eyewitnesses at trial made in-court identifications of Sherls and testified that they recognized him based upon his characteristics and observations they had made during the incident.
We conclude that the show-up and photo array identification procedures were not unduly suggestive and that the eyewitnesses' identifications, both before and during trial, were sufficiently reliable.
The First Assignment of Error is overruled.
 III
The Second Assignment of Error is as follows:
 THE VERDICT AGAINST MR. SHERLS WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Sherls's argument that his conviction for Aggravated Robbery is against the weight of the evidence is based upon his claims that the eyewitness identifications are unreliable and that he presented an alibi. He does not deny that the State presented evidence of all the elements of Aggravated Robbery. He contends that he was not the perpetrator.
To reverse a jury verdict as being against the manifest weight of the evidence, a reviewing court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and conclude that, in resolving the conflicts in the evidence, the jury clearly lost its way and created a manifest miscarriage of justice. State v. Martin (1983), 20 Ohio App.3d 172,175. "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id.
As stated in Part II, above, we conclude that the eyewitness identifications of Sherls were inherently reliable and were properly admitted. Therefore, we are not persuaded by the argument that the conviction is against the weight of the evidence because of the unreliability of those identifications.
Sherls did present alibi testimony from Hasani Adams. This testimony was irreconcilable with that of the eyewitnesses. In reviewing the weight of the evidence, the witnesses' credibility and the weight to be given their testimony are matters primarily for the trier of fact since the trier of fact is in the best position to judge the witnesses' credibility by observing their demeanor. State v. Hayes (Sep. 14, 2001), Champaign App. No. 2000-CA-27, unreported, citations omitted. We have reviewed Adams' testimony. He appears to have had difficulty recalling the date that he was with Sherls, testifying that it was in July, rather than on June 30. We conclude that the jury could reasonably have found Adams' testimony less credible than the testimony of the eyewitnesses.
Accordingly, the Second Assignment of Error is overruled.
 IV
Both assignments of error having been overruled, the judgment of the trial court is Affirmed.
WOLFF, P.J,. and BROGAN, J., concur.