[Cite as *State v. Murphy*, 2023-Ohio-3276.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29559 |
| | : | |
| v. | : | Trial Court Case No. 2020 CR 03798 |
| | : | |
| JEREMY MURPHY | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on September 15, 2023

. . . . . . . . . . .

MATHIAS H. HECK, JR., by RICKY L. MURRAY, Attorney for Appellee

ADAM J. ARNOLD, Attorney for Appellant

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Appellant, Jeremy Murphy, appeals from his convictions for felony murder with a firearm specification, tampering with evidence, and having weapons while under disability following a jury trial in the Montgomery County Court of Common Pleas. In support of his appeal, Murphy contends that the trial court should have suppressed evidence pertaining to a witness's pretrial identification of him on grounds that the

identification process was unduly suggestive and unreliable. Murphy also contends that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. For the reasons outlined below, we disagree with Murphy's claims and will affirm the judgment of the trial court.

**Facts and Course of Proceedings**

{¶ 2} On December 14, 2020, a Montgomery County grand jury returned an 11-count indictment charging Murphy with four counts of felony murder, two counts of felonious assault, two counts of aggravated robbery, one count of tampering with evidence, and two counts of having weapons while under disability. The counts for felony murder, felonious assault, and aggravated robbery all included three-year firearm specifications. The counts were broken down as follows:

**Felony Murder** - 4 counts (unclassified felonies)

1. R.C. 2903.02(B): proximate cause/felonious assault/serious physical harm

2. R.C. 2903.02(B): proximate cause/felonious assault /deadly weapon

3. R.C. 2903.02(B): proximate cause/agg. robbery/serious physical harm

4. R.C. 2903.02(B): proximate cause/agg. robbery/deadly weapon

**Felonious Assault** - 2 counts (second-degree felonies)

1. R.C. 2903.11(A)(1): serious physical harm

2. R.C. 2903.11(A)(2): deadly weapon

**Aggravated Robbery** - 2 counts (first-degree felonies)

1. R.C. 2911.01(A)(1): deadly weapon

2. R.C. 2911.01(A)(3): serious physical harm

**Tampering with Evidence** - 1 count (third-degree felony)

1. R.C. 2921.12(A)(1)

**Having Weapons While Under Disability** - 2 counts (third-degree felonies)

1. R.C. 2923.13(A)(2): felony offense of violence

2. R.C. 2923.13(A)(3): felony drug offense

**{¶ 3}** The indicted charges and specifications stemmed from allegations that, during the early morning hours of December 4, 2020, Murphy shot and killed William Bruce inside a Dayton residence after Murphy demanded all of Bruce's money. It was also alleged that Murphy ran to his residence after the shooting, concealed the firearm in his basement, and bleached the clothing that he had been wearing. Murphy pled not guilty to all the indicted charges and specifications and thereafter filed a motion to suppress.

**{¶ 4}** In his motion to suppress, Murphy argued, among other things, that due process required the suppression of all evidence pertaining to an eyewitness's pretrial identification of him. Murphy claimed that suppression of the pretrial identification was necessary because the identification process had been unduly suggestive and unreliable. Specifically, Murphy took issue with the fact that the police had presented the eyewitness with only his photograph and not a photospread of various individuals. On May 12, 2021, and August 20 and 21, 2021, the trial court held evidentiary hearings on Murphy's motion

to suppress. Following these hearings, the trial court issued a decision overruling the motion.

{¶ 5} After the trial court overruled Murphy's motion to suppress, the matter proceeded to a three-day jury trial. During trial, the State presented testimony from several witnesses, including the eyewitness who had identified Murphy as Bruce's killer, Tiffany Miser. The State also presented testimony from multiple investigating police officers, the coroner who examined Bruce's body, a forensic firearms expert, and a forensic DNA expert. In his defense, Murphy presented the testimony of his live-in girlfriend, Helen Wingeier. The following is a summary of the testimony that was presented at trial.

{¶ 6} At approximately two or three in the morning on December 4, 2020, Murphy, Bruce, and a third individual named Dave Kenny arrived at Miser's residence on Noel Court in the city of Dayton, Montgomery County, Ohio, in order to get warm and use methamphetamine. Miser knew Murphy and Kenny from the neighborhood and had been acquainted with them for a few years. Miser had previously purchased drugs from Murphy and had been to his house a couple of times. Miser, however, did not know Murphy's real name; she only knew him as "Fox." Before that morning, Miser had never met the third individual, Bruce, who went by the name "Red."

{¶ 7} After Miser allowed Murphy, Kenny, and Bruce inside her residence, the three men began using methamphetamine in her living room. Miser did not partake in the drug use because she preferred heroin. After the three men entered her residence, Miser immediately went to her bathroom to get ready to go out and meet a "friend" for

whom she was going to perform sexual favors in exchange for money.

{¶ 8} No more than ten minutes after Murphy, Bruce, and Kenny arrived, Bruce ran into the bathroom with Miser, locked the door, and told Miser that "Fox" (Murphy) was going to shoot and kill him if he did not give Murphy all of his money. During that time, Miser saw Murphy running at Bruce and Bruce slam the bathroom door just before Murphy could get in. Immediately thereafter, Miser heard Murphy kicking at the bathroom door.

{¶ 9} Frightened by what was happening, Miser jumped out of her bathroom window onto an enclosed back porch. From the back porch, Miser ran and hid next to her neighbor's garage. While hiding next to the garage, Miser heard a gunshot and then saw Murphy run out of the back of her house and toward Fillmore and Nassau Streets, the area where she knew Murphy lived. Miser did not know where Kenny went after the incident.

{¶ 10} After Miser saw Murphy running away, she ran and found someone in the neighborhood that she knew and used their cell phone to call 9-1-1. Shortly thereafter, Officer Bradon Halley of the Dayton Police Department responded to Miser's location. When Ofc. Halley made contact with Miser, Miser frantically told him what had occurred at her residence. Halley then went to Miser's residence to look for a victim.

{¶ 11} Upon entering Miser's residence, Ofc. Halley observed that the paneling on Miser's bathroom door had been broken out. Halley also observed a male, later identified as Bruce, lying on the bathroom floor. As other officers conducted a protective sweep of the residence, Halley checked on Bruce's condition; Halley determined that Bruce had no pulse and there were gunshot wounds to his upper right torso and lower

left torso. Halley then moved Bruce to the living room so that medics could have more space to treat him. Upon doing so, a spent shell casing fell on the ground from Bruce's person. The shell casing was collected as evidence and sent to the Miami Valley Regional Crime Lab ("MVRCL") for analysis. Later in the investigation, another officer discovered a single bullet lodged in the bathroom wall between the toilet and the bathtub. The bullet, however, could not be recovered.

{¶ 12} While officers were searching Miser's residence on the morning of the shooting, Miser assisted the investigation by providing officers with a physical description of Murphy and the name by which she knew him, i.e., "Fox." As part of her description, Miser told the officers that Murphy had been wearing black Carhartt coveralls and purple-rimmed eyeglasses. Miser also told the officers that Murphy lived near her residence in the area of Fillmore and Nassau Streets.

{¶ 13} As Miser was being interviewed in the back of a police cruiser, Officer Sarah Weidner of the Dayton Police Department was seated in the front of the same cruiser using the computer to research information on the suspect that Miser was describing. While doing so, Ofc. Weidner received a message on the computer from another officer. The message contained a photograph of a possible suspect that went by the alias "Fox." The person depicted in the photograph was Murphy. When Weidner opened the message, the photograph of Murphy popped up on the computer screen. Weidner did not intend for Miser to see the photograph, but Miser saw it from where she was seated in the back of the police cruiser. When Miser saw the photograph, she immediately pointed to it and identified the suspect in the photograph as "Fox."

{¶ 14} Miser was thereafter taken to the Dayton Police Department's Safety Building for a full interview with Detective Sergeant Walt Steele. During the interview, Steele showed Miser the same photograph of Murphy that she had seen in the back of the police cruiser. Upon seeing the photograph a second time, Miser once again identified Murphy's photograph as depicting the suspect, "Fox." Miser signed and dated the photograph and notated that she was 100% sure that the photograph depicted the person she knew as "Fox." *See* State's Exhibit 56.

{¶ 15} After Miser positively identified Murphy as the suspect, several police officers responded to Murphy's residence on Hulbert Street on the morning of the shooting. Murphy's residence was located just one-half mile from Miser's residence on Noel Court. Officers surrounded Murphy's residence and gave exit commands over a public address system. Murphy's live-in girlfriend, Helen Wingeier, and her two children eventually exited the residence and were placed in the back of a police cruiser. Murphy, however, refused to exit, which resulted in a Dayton SWAT team being called out to Murphy's residence.

{¶ 16} Officer Stephen Lloyd, a Dayton SWAT team member, testified that noise flash diversion devices and gas munition rounds were deployed in an effort to get Murphy to exit his residence. Murphy, however, barricaded himself in his residence for over 2.5 hours before coming out. When Murphy eventually came out, he was apprehended by Ofc. Lloyd, who observed insulation on the shoulders and back of the sweatshirt Murphy was wearing.

{¶ 17} Det. Sgt. Steele also observed insulation on Murphy's clothing and hair

when he interviewed Murphy following his apprehension. Steele additionally observed that Murphy was wearing purple-rimmed eyeglasses. During his interview, Murphy initially stated that he did not know Miser and had never been to Miser's residence. However, later in the interview, Murphy acknowledged that he knew Miser and stated that he had been to her residence three days earlier.

{¶ 18} Following the issuance of a search warrant, officers searched Murphy's residence and found a pair of black Carhartt coveralls in a washing machine located in the basement. The coveralls were discolored from bleach and there was an overwhelming smell of bleach coming from the washing machine. A container of bleach was discovered in the residence's bathtub. In addition to some other items, the washing machine contained a pair of gloves and a single nine-millimeter live round of ammunition.

{¶ 19} The search of the basement also yielded an unloaded Smith and Wesson M&P nine-millimeter semiautomatic handgun. The handgun was found tucked in an area between the basement's wall and ceiling. The handgun had been shoved into some insulation in the ceiling area. On the second floor of the residence, insulation was also found on a closet floor underneath an attic access.

{¶ 20} Aaron Davies, a firearms expert with the Miami Valley Regional Crime Lab (MVRCL), examined the handgun and testified that it was operable and in good working condition. Davies also testified that the live round of ammunition discovered in Murphy's washing machine could be fired from the handgun. More significantly, after comparing test fires from the handgun, Davies testified to a reasonable degree of scientific certainty that the shell casing that had fallen from Bruce's person at the crime scene had been fired

from the handgun discovered in Murphy's basement.

{¶ 21} Mary Barger, a forensic DNA expert with the MVRCL, performed DNA analysis on the handgun and other items of evidence collected at the crime scene. With respect to a majority of the evidence, Barger testified that there had not been enough DNA present for her to analyze. However, there had been sufficient DNA detected on the handgun. Barger testified that the results of the DNA analysis on the handgun excluded both Muphy and Bruce as possible DNA contributors. Nevertheless, Barger testified that a person's DNA is not always left on an item that the person touches. Barger explained that this can be due to the person's not leaving enough skin cells behind or due to the person's wearing gloves or wiping the item clean. Significantly, Barger testified that bleach completely destroys DNA.

{¶ 22} The coroner who examined Bruce's body testified that Bruce's death was a homicide caused by a gunshot wound to the chest. Specifically, the coroner testified that Bruce had a through-and-through gunshot wound in which the bullet entered through his right upper chest and exited through his left lower back. The coroner also testified that Bruce's blood tested positive for fentanyl, cocaine, marijuana, and methamphetamine but confirmed that Bruce's cause of death was not drug-related.

{¶ 23} Following its presentation of the foregoing testimony, the State rested its case. Murphy moved for an acquittal pursuant to Crim.R. 29(C), which the trial court overruled. Murphy then called his live-in girlfriend, Wingeier, to testify on his behalf. During her testimony, Wingeier confirmed that Murphy went by the nickname "Fox." Wingeier also confirmed that Murphy owned a pair of coveralls and lived with her at the

Hulbert Street residence. Wingeier testified that she did not use bleach on colored clothing and that she was unaware of any firearm being inside her residence. Wingeier also testified that on December 4, 2020, she and Murphy had gone to bed at approximately two in the morning and she had woken up to the police yelling for Murphy to come out with his hands up. Wingeier admitted that she had been asleep between two in the morning and the time that the police had arrived, and thus had no idea what had gone on during that period of time.

{¶ 24} Based on the testimony and evidence presented at trial, the jury found Murphy guilty of all the felony murder counts, felonious assault counts, aggravated robbery counts, and the count of tampering with evidence. The jury also found Murphy guilty of all the attendant firearm specifications. Because Murphy stipulated to having a prior conviction for a felony offense of violence and a prior conviction for a felony drug offense, the trial court also found Murphy guilty of the two counts of having weapons while under disability.

{¶ 25} At sentencing, the trial court merged all of the felony murder, felonious assault, and aggravated robbery counts and their attendant firearm specifications. Following the merger, the State elected to have Murphy sentenced for the count of felony murder that alleged a predicate of offense of felonious assault with a deadly weapon. The trial court imposed 15 years to life in prison for that offense plus a consecutive three-year prison term for the firearm specification. The trial court also merged the two counts of having weapons while under disability, and the State elected to have Murphy sentenced on the count alleging a prior felony offense of violence. Thereafter, the trial

court imposed a concurrent three-year prison term for having weapons while under disability and a consecutive three-year prison term for tampering with evidence. Accordingly, the trial court imposed a total, aggregate term of 21 years to life in prison for Murphy's offenses.

{¶ 26} Murphy appeals from his convictions, raising three assignments of error for this court's review.

## First Assignment of Error

{¶ 27} Under his first assignment of error, Murphy challenges the trial court's decision overruling his motion to suppress Miser's pretrial identification of him. Murphy claims that Miser's pretrial identification should have been suppressed because the identification process utilized by the investigating officers was unduly suggestive and unreliable.

*Standard of Review*

{¶ 28} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. When ruling on a motion to suppress, "the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d

19, 437 N.E.2d 583 (1982). "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (4th Dist.1997).

*Pretrial Identification*

**{¶ 29}** " 'When a witness has been confronted with a suspect before trial, due process requires a court to suppress her identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt *and* the identification was unreliable under all the circumstances.' " (Emphasis sic.) *State v. Beckham*, 2d Dist. Montgomery No. 19544, 2003-Ohio-3837, ¶ 10, quoting *State v. Murphy*, 91 Ohio St.3d 516, 534, 747 N.E.2d 765 (2001). Therefore, courts apply a two-step test when determining whether suppression of a challenged identification is warranted. *State v. Kelly*, 2d Dist. Clark No. 2020-CA-8, 2021-Ohio-325, ¶ 12. First, courts must determine whether the defendant showed "that the identification procedure was unduly suggestive." *Beckham* at ¶ 10. "If the defendant meets that burden, the court must then consider whether the identification, viewed under the totality of the circumstances, is reliable despite the suggestive procedure." (Citation omitted.) *Id.*

**{¶ 30}** In this case, the State does not dispute that the first prong of the aforementioned test has been satisfied, i.e., that the identification procedure was unduly suggestive. This is because the investigating officers only presented Miser with a photograph of Murphy. "The United States Supreme Court has acknowledged that the

danger of an incorrect identification is increased where only one photograph is displayed to a witness." *State v. Padgett*, 2d Dist. Greene No. 1999-CA-87, 2000 WL 873218, *2 (June 30, 2000), citing *Simmons v. United States*, 390 U.S. 377, 383, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Therefore, "[c]ourts generally find the use of a single photograph for identification purposes impermissibly suggestive absent extraordinary circumstances." (Citation omitted.) *State v. Bates*, 110 Ohio St.3d 1230, 2006-Ohio-3667, 850 N.E.2d 1208, ¶ 8. *See, e.g., Padgett* at *3 (using a single photograph in the identification procedure was inherently suggestive and was unnecessary since there were no exigent circumstances and a photo array could easily have been prepared); *State v. Henderson*, 2d Dist. Montgomery No. 28241, 2020-Ohio-6, ¶ 20 (an "identification procedure, which involves showing just one individual to an eyewitness, as opposed to a lineup of different individuals, is inherently suggestive").

{¶ 31} Despite the unduly suggestive identification procedure used in this case, Miser's identification of Murphy may nevertheless survive constitutional challenge if there was evidence establishing that her identification was sufficiently reliable under the totality of the circumstances. *Henderson* at ¶ 20, citing *State v. Martin*, 127 Ohio App.3d 272, 277, 712 N.E.2d 795 (2d Dist.1998). "So long as the identification possesses sufficient aspects of reliability, there is no violation of due process." *State v. Sherls*, 2d Dist. Montgomery No. 18599, 2002 WL 254144, *3 (Feb. 22, 2002).

{¶ 32} "Five factors establish reliability: (1) the opportunity of the witness to view the defendant at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of any prior description of the defendant given by the witness, (4) the level of

certainty demonstrated by the witness as to the identification, and (5) the length of time between the crime and the identification." *Bates* at ¶ 9, citing *Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

{¶ 33} In this case, following the suppression hearing, the trial court found that Miser had testified that Murphy entered her home during the early morning hours of December 4, 2020, wearing black coveralls and purple-rimmed eyeglasses. The trial court also found that Miser had testified to knowing Murphy as "Fox," knowing the area where Murphy lived, and knowing Murphy's live-in girlfriend, Wingeier. In addition, the trial court found that Miser had testified that she had not seen Murphy for a year and a half before December 4, 2020, but that she had previously seen Murphy every day for a couple of years because Murphy had been her drug dealer. The trial court further found that Miser had testified to recognizing Murphy's voice as the voice yelling at Bruce just before she jumped out of the bathroom window and to observing Murphy running from her house after she heard gunshots.[1] The trial court also found that Miser had spontaneously identified Murphy as Bruce's assailant when Miser saw Murphy's picture in the police cruiser and that Miser's identification of Murphy was made shortly after the police responded to the crime scene. In addition, the trial court found that Murphy had been wearing purple-rimmed glasses when he was apprehended on the morning of the shooting.

---

[1] During the suppression hearing, Miser testified that she had heard two gunshots, but during trial, Miser testified to hearing only one gunshot. At trial, Miser acknowledged that she had previously indicated that she had heard two gunshots, but explained that she was unsure, and knew that she had heard at least one gunshot. Trial Tr. Vol. I, p. 183; Suppression Hearing Tr., p. 22.

{¶ 34} Although the trial court recognized that there were some inconsistencies between Miser's suppression hearing testimony and what Miser had told police officers at the scene, the trial court found that Miser's testimony was credible and applied it to the identification-reliability analysis. The trial court found that Miser had admitted to having trouble remembering what she told each police officer because she had spoken to so many officers on the night of the shooting. The trial court also attributed Miser's inconsistencies to potential fear of retaliation from Murphy and initial shock. In addition, the trial court determined that the inconsistencies in Miser's testimony did not affect the key facts in the identification-reliability analysis.

{¶ 35} Upon review, we find that the trial court's findings were supported by competent, credible evidence in the record. When applying those findings to the applicable legal standard, we find that the totality of the circumstances established that Miser's identification of Murphy was reliable; Miser's testimony established that she had known Murphy for a couple of years and had been able to provide reliable details about Murphy's appearance, i.e., his purple-rimmed eyeglasses and black coveralls. Miser's testimony also indicated that she had had the opportunity to view Murphy near the time of the crime and that she had paid a high degree of attention to Murphy's appearance. It was also significant that Miser's description of Murphy was accurate, as the record established that Murphy had been wearing purple-rimmed eyeglasses when he was apprehended by the police.

{¶ 36} Furthermore, the length of time between the shooting and Miser's identification of Murphy was not long; Miser identified Murphy's photograph in the police

cruiser shortly after the police responded to her 9-1-1 call. In addition, the video evidence from the police cruiser established that Miser had immediately identified Murphy when she saw his photograph and that she had exhibited certainty when identifying him. *See* State's Suppression Hearing Exhibit 1 at 17:21. Also, Miser signed and dated Murphy's photograph and noted that she was 100% certain that the photograph depicted the person she knew as "Fox." *See* State's Suppression Hearing Exhibit 2.

**{¶ 37}** When viewing the totality of these facts and circumstances, we conclude that, despite the suggestiveness inherent in using only Murphy's photograph in the identification process, Miser's identification of Murphy was reliable and thus admissible at trial. Therefore, the trial court did not err when it overruled Murphy's motion to suppress Miser's pretrial identification of him.

**{¶ 38}** Murphy's first assignment of error is overruled.

## Second and Third Assignments of Error

**{¶ 39}** Under his second assignment of error, Murphy contends that the trial court erred by overruling his Crim.R. 29(C) motion for acquittal on grounds that his convictions were not supported by sufficient evidence. Under his third assignment of error, Murphy contends that his convictions were against the manifest weight of the evidence. Upon review, we disagree with both of Murphy's claims.

### Standards of Review

**{¶ 40}** "A sufficiency of the evidence argument disputes whether the State has

presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.) *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." (Citations omitted.) *Id.*

{¶ 41} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61, 2013-CA-62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14.

{¶ 42} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). Therefore, "[t]he credibility of the witnesses and the weight to be given to their testimony are matters for the trier of fac[t] to resolve." *State v. Hammad*, 2d Dist. Montgomery No. 26057, 2014-Ohio-3638, ¶ 13, citing *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "This court will not substitute its judgment for that of the trier of fac[t] on the issue of witness credibility unless it is patently apparent that the factfinder lost its way." (Citation omitted.) *State v. Bradley*, 2d Dist. Champaign No. 1997-CA-3, 1997 WL 691510, *4 (Oct. 24, 1997).

{¶ 43} In this case, Murphy was convicted of one count of felony murder in violation of R.C. 2903.02(B), one count of tampering with evidence in violation of R.C. 2921.12(A)(1), and one count of having weapons while under disability in violation of R.C. 2923.13(A)(2). Murphy was also convicted of a three-year firearm specification that was attached to the count of felony murder. Each of the charges and the firearm specification are addressed separately below.

*Felony Murder*

{¶ 44} R.C. 2903.02(B), the statute governing the offense of felony murder, provides that: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree[.]" Pursuant to that provision, the "commission of another

felony offense is a necessary predicate to an R.C. 2903.02(B) offense, and the predicate felony must be a proximate cause of the death R.C. 2903.02(B) prohibits." (Citation omitted.) *State v. Cook*, 2d Dist. Montgomery No. 23721, 2010-Ohio-6222, ¶ 49.

{¶ 45} In this case, the predicate felony offense at issue is felonious assault in violation of R.C. 2903.11(A)(2), which provides that: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." The term "deadly weapon" is defined as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2903.11; R.C. 2923.11(A). It is well established that a firearm is a "deadly weapon." *See State v. Wilson*, 2d Dist. Clark No. 2021-CA-68, 2022-Ohio-3763, ¶ 68; *State v. Reese*, 2d Dist. Montgomery No. 22907, 2009-Ohio-5046, ¶ 37; *State v. Hazley*, 2d Dist. Montgomery No. 10496, 1988 WL 95901, *3, (Sept. 15, 1988).

{¶ 46} As part of its case-in-chief, the State presented testimony from Miser, who identified Murphy as the individual who shot Bruce. Murphy claims that there was insufficient evidence to convict him of felony murder because Miser's identification of him was unreliable and inadmissible. However, under Murphy's first assignment of error, we have already determined that Miser's identification of Murphy was reliable and therefore admissible at trial.

{¶ 47} Miser's trial testimony established that Murphy, Bruce, and Kenny entered Miser's residence during the early morning hours of December 4, 2020, to use drugs and keep warm. Miser's testimony also established that within ten minutes of their arrival,

Bruce ran into Miser's bathroom where Miser had been getting ready, locked the bathroom door, and told Miser that Murphy had said that he was going to shoot and kill him if he did not give Murphy all of his money. In addition, Miser's testimony established that Miser saw Murphy run at Bruce[2] just before Bruce slammed the bathroom door and then heard Murphy kicking the bathroom door. Miser's testimony further established that, after jumping out of her bathroom window and hiding by her neighbor's garage, Miser heard a gunshot and then saw Murphy run out of her backdoor and in the direction of his residence.

{¶ 48} In addition to Miser's eyewitness testimony, the State presented evidence establishing that responding police officers discovered Bruce's dead body in Miser's bathroom after Miser called 9-1-1. The testimony of the coroner who examined Bruce's body established that Bruce's death was a homicide caused by a through-and-through gunshot wound. Although the bullet that struck Bruce could not be recovered, the evidence established that a shell casing was recovered from the area of Bruce's body. The testimony of the State's firearms expert established that the shell casing had been fired from the Smith and Wesson M&P nine-millimeter handgun discovered in Murphy's basement ceiling. The State also presented evidence establishing that the handgun was tucked into some insulation in the ceiling and that Murphy had insulation on his clothing and in his hair when he was apprehended by the police.

{¶ 49} The State's evidence further established that Miser had observed Murphy wearing black Carhartt coveralls at the time of the shooting, and that on the morning of

---

[2] We note that during the motion to suppress hearing, Miser did not testify to seeing Murphy run at Bruce; instead, Miser testified to hearing Murphy's voice yelling at Bruce.

the shooting, the police discovered black Carhartt coveralls covered in bleach in Murphy's basement washing machine. The police also discovered a single 9-millimeter live round of ammunition in the washing machine, which the firearms expert testified was capable of being fired from the handgun in Murphy's basement. The evidence also established that Murphy's live-in girlfriend was sleeping at the time of the shooting and could not account for Miser's whereabouts. The State further presented evidence establishing that Murphy barricaded himself in his residence for over two and a half hours before he complied with the demands of the police and SWAT team for him to exit, which suggested that Murphy had something to hide and was guilty of wrongdoing.

{¶ 50} When viewed in a light most favorable to the State, we find that the aforementioned evidence would permit a reasonable jury to conclude that Murphy had been the individual who fired the gunshot that killed Bruce. Therefore, we find that there was sufficient evidence to convict Murphy of felony murder via felonious assault, as the evidence sufficiently established that Murphy had caused physical harm to Bruce by shooting him with a deadly weapon and that the shooting had been the proximate cause of Bruce's death.

{¶ 51} After weighing all the evidence and reasonable inferences, we do not find that the jury clearly lost its way and created a manifest miscarriage of justice in finding Murphy guilty of felony murder. The weight of the evidence, particularly Miser's eyewitness testimony and the evidence concerning the firearm, overwhelmingly supported the jury's guilty verdict. Accordingly, Murphy's conviction for felony murder was not against the manifest weight of the evidence.

*Firearm Specification*

**{¶ 52}** Murphy was also convicted of the three-year firearm specification that was attached to the felony murder count. To be convicted of this specification, the evidence had to establish that Murphy "had a firearm on or about [his] person or under [his] control while committing the offense and displayed the firearm, brandished the firearm, indicated that [he] possessed the firearm, or used it to facilitate the offense." R.C. 2941.145(A); R.C. 2929.14(B)(1)(a)(ii). Because a reasonable jury could have concluded from the evidence that Murphy committed felony murder by shooting Bruce with a firearm, we find that Murphy's conviction for the three-year firearm specification was supported by sufficient evidence. Because the weight of the evidence supported the jury's finding that Murphy committed felony murder in such a manner, we also find that Murphy's conviction for the firearm specification was not against the manifest weight of the evidence.

*Tampering with Evidence*

**{¶ 53}** Next, Murphy was convicted of tampering with evidence in violation of R.C. 2921.12(A)(1), which provides that: "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]" Accordingly, "[t]here are three elements of this offense: (1) knowledge of an official proceeding or investigation in progress or likely to be instituted, (2) the alteration, destruction,

concealment, or removal of the potential evidence, (3) the purpose of impairing the potential evidence's availability or value in such proceeding or investigation." *State v. Straley*, 139 Ohio St.3d 339, 2014-Ohio-2139, 11 N.E.3d 1175, ¶ 11.

{¶ 54} "[K]nowledge of a likely investigation may be inferred when the defendant commits a crime that is likely to be reported." *State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, ¶ 118. *Accord State v. Bonaparte*, 2d Dist. Clark No. 2018-CA-61, 2019-Ohio-2030, ¶ 40-41. For example, "[h]omicides are highly likely to be discovered and investigated." *Martin* at ¶ 118. In *Bonaparte*, we held that a jury could have reasonably inferred that the defendant knew his offenses were likely to be investigated where the defendant shot the victim numerous times at close range and was aware that there was at least one witness to the shooting. *Bonaparte* at ¶ 41.

{¶ 55} In this case, the State presented evidence establishing that Murphy shot Bruce and then ran from the scene all while knowing that Miser (and possibly Kenny) had witnessed their confrontation. In addition, the evidence established that, not long after the shooting, Murphy was confronted with multiple police officers and a SWAT team at his residence. From this evidence, a reasonable jury could infer that Murphy had had knowledge that an official investigation would likely be instituted or was already in progress. Therefore, the first element of tampering with evidence was sufficiently established by the evidence.

{¶ 56} The second and third elements, i.e., alteration, destruction, concealment, or removal of potential evidence for the purpose of impairing the potential evidence's availability or value in an investigation, were also sufficiently established, because the

evidence established that Murphy had concealed the handgun used to shoot Bruce in some insulation in his basement ceiling. A reasonable jury could have concluded that Murphy was the one who concealed the handgun because his live-in girlfriend testified to being unaware of any firearm in the residence and because Murphy was observed with insulation on his clothing and hair when he was apprehended. Because the handgun was positively identified as the weapon that fired the shell casing that fell from Bruce's body, and because Murphy was confronted by police officers and a SWAT team at his residence just prior to the firearm's being found, a reasonable jury could have inferred that Murphy concealed the firearm in his basement ceiling in order to impair its availability in the ensuing investigation.

{¶ 57} The State's evidence also established that Miser had observed Murphy wearing black Carhartt coveralls during the shooting incident and that police officers discovered black Carhartt coveralls covered in bleach in Murphy's washing machine. The testimony from the State's forensic DNA expert established that bleach completely destroys DNA. Because DNA is an investigative tool, and because Murphy was faced with police officers and a SWAT team at his residence on the morning of the shooting, a reasonable jury could have inferred that Murphy bleached his black coveralls as a means to destroy any possible DNA evidence that may have implicated him in Bruce's shooting so as to impede the ensuing investigation.

{¶ 58} In addition, the evidence established that Murphy had barricaded himself in his residence for over two and a half hours before complying with the police and SWAT team's demands for him to exit. From that evidence, a reasonable jury could have

concluded that Murphy was using that time to conceal and destroy evidence.

{¶ 59} When viewed in a light most favorable to the State, we find that all of the aforementioned evidence permitted a reasonable jury to conclude that Murphy was guilty of tampering with evidence. Furthermore, after weighing all the evidence and reasonable inferences, we do not find that the jury clearly lost its way and created a manifest miscarriage of justice when it found Murphy guilty of tampering with evidence. Accordingly, Murphy's conviction for tampering with evidence was supported by sufficient evidence and was not against the manifest weight of the evidence.

*Having Weapons While Under Disability*

{¶ 60} Lastly, Murphy was convicted of having weapons while under disability in violation of R.C. 2923.13(A)(2), which provides, in pertinent part, that unless relieved from disability, "no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person * * * has been convicted of any felony offense of violence[.]" In this case, Murphy stipulated to having a prior felony conviction of violence in Hamilton County Common Pleas Court Case No. B 0900795. *See* Trial Tr. Vol. III, p. 537-538. Based on this stipulation and the evidence regarding the handgun discovered in Murphy's basement ceiling, we find that there was sufficient evidence to support Murphy's conviction for having weapons while under disability and that the conviction was not against the manifest weight of the evidence.

{¶ 61} Because Murphy's convictions for felony murder with a firearm specification, tampering with evidence, and having weapons while under disability were

supported by sufficient evidence and were not against the manifest weight of the evidence, Murphy's second and third assignments of error are overruled.

## Conclusion

{¶ 62} Having overruled all three of Murphy's assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

EPLEY, J., concurs.

TUCKER, J., concurs:

{¶ 63} Though I concur in the majority opinion's conclusions, I write separately to suggest that where, as here, the witness, based upon previous contact with the suspect, knows the suspect being identified, the identification procedure cannot, as a matter of common sense, be unnecessarily suggestive. And, in this circumstance, even if the identification procedure is assumed to be unnecessarily suggestive, the reliability of the identification cannot credibly be questioned because a person will not misidentify someone she knows. *State v. Huff*, 145 Ohio App.3d 555, 564-565, 763 N.E.2d 695 (1st Dist.2001); *State v. Levingston*, 1st Dist. Hamilton No. C-090235, 2011-Ohio-1665, ¶ 9.